**V.G. NAHRGANG CO., f/a Anthony Paglialungo, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 84–678.**

United States Court of Appeals,
Federal Circuit.

Aug. 16, 1984.

Steven P. Sonnenberg, Chicago, Ill., argued for appellant. With him on the brief was Paul S. Anderson, Chicago, Ill.

Jerry P. Wiskin, New York City, argued for appellee. With him on the brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Branch Director, Washington, D.C. and Joseph I. Liebman, New York City, Attorney-in-Charge Intern. Trade Field Office.

Before FRIEDMAN, KASHIWA and MILLER, Circuit Judges.

PER CURIAM.

This is an appeal from a judgment of the United States Court of International Trade (No. 81-4-00410) entered August 8, 1983. Appellant's motion for rehearing was denied on October 26, 1983. The trial court sustained United States Customs Service's classification of the articles under item 355.25 of the Tariff Schedules of the United States ("TSUS"). We affirm.

### Background

Nahrgang imported certain rolls of waterproofing material from Italy which were described in the invoices submitted to the Customs Service as "Paralon NT4" and "Paralon 77." The imported goods, which are used for roofing and other waterproofing applications, consist of a mastic composed of modified bitumen (a mixture of 70% by weight of bitumen and 30% by weight of various polypropylenes) and a nonwoven polyester fabric core. The nonwoven polyester fabric core (sold under the trade name "Trevira") used in the Paralon NT4 weighs 150 grams per square meter while the fabric used in the Paralon 77 weighs 130 grams per square meter. Other than bitumen, polypropylenes and polyester fabric, there are small quantities of other component materials in the merchandise which are not relevant to this case.

The imported goods are produced in the following manner. The mastic is first produced by mixing hot bitumen in a liquid state with the polypropylenes, and the resultant mixture is then formed into a membrane. After production of the mastic in the form of a membrane, the nonwoven polyester core is sunk into the mastic. The additional minor components in the products facilitate adhesion in their application and act as an antiadhesive to make the material easier to unroll.

The sole use of the Paralon products is for the waterproofing of roofs and other waterproofing applications. While bitumen alone has good waterproofing characteristics, polypropylene (a waterproof plastic material) is added to the bitumen as a modifying agent for the purpose of imparting flexibility to the mastic. The nonwoven polyester fabric core, not waterproof in itself, contributes tensile strength essential to an effective and "workable" waterproofing membrane. Additionally, the polyester fabric is used to obtain a waterproofing sheet in a continuous form in the fabrication process.

The Customs Service classified the Paralon articles under item 355.25 of the TSUS,[1] with duty assessed at the rate of 12 cents per pound plus 15 per centum ad valorem.

### Lower Court Proceeding

At trial, as well as here, Nahrgang asserted that the imported articles should have been classified under item 771.42 of the TSUS[2] because the articles are "wholly or almost wholly of * * * plastics." If

1. Item 355.25 states:
   Schedule 3, Part 4, Subpart C—Wadding, Felts, and Articles Thereof; Fish Netting and Nets; Artists' Canvas; Coated or Filled Fabrics; Hose; Machine Clothing; Other Special Fabrics

   *      *      *      *      *      *

   Webs, wadding, batting, and nonwoven fabrics, including felts and bonded fabrics, and articles not specially provided for of any one or combination of these products, all the foregoing, of textile materials, whether or not coated or filled:

   *      *      *      *      *      *

   355.25  Of manmade fibers..............12¢ per lb.
                                    + 15% ad val

2. Item 771.42 states:
   Schedule 7, Part 12, Subpart B — Rubber and Plastics Waste and Scrap; Rubber and Plastic Film Strips, Sheets, Plates, Slabs, Blocks, Filaments, Rods, Tubing and Other Profile Shapes

   *      *      *      *      *      *

   Film, strips, sheets, plates, blocks, filaments, rods, seamless tubing, and other profile shapes, all of the foregoing wholly or almost wholly of rubber or plastics:

   *      *      *      *      *      *

   Not of cellulosic plastics materials: Film strips, and sheets, all the foregoing which are flexible:

   *      *      *      *      *      *

   771.42  Other............................... 6% ad val

Nahrgang's proposed classification is correct, then the Government's classification under item 355.25 is precluded by virtue of headnote 1(vii), Schedule 3, Part 4, Subpart C.[3] Nahrgang contended (1) that the essential character of the imported article is its waterproofing capability which is imparted by the mastic portion and (2) that the mastic portion is a "synthetic plastics material" as defined in headnote of Schedule 7, Part 12,[4] which in turn is further defined in headnote 2 of Schedule 4, Part 4, Subpart A.[5]

The lower court found:

While I agree with plaintiff that the essential character of the merchandise is its waterproofing capability, plaintiff has failed to prove its claim that the mastic portion of the merchandise is a synthetic plastics material as defined in headnote 2 of Schedule 4, Part 4, Subpart A.

Plaintiff's argument, essentially, is, that the mastic portion is a "synthetic plastics material" because bitumen constitutes an organic material and polypropylene is specifically mentioned in the headnote definition. Although the evidence shows that polypropylene was mixed with the bitumen as a modifier to impart flexibility to the mastic, neither the bitumen in itself nor the mastic material as a whole was established to be a synthetic plastics material. To fall within the definition of "synthetic plastics materials" in headnote 2, part 4A, Schedule 4, a material must be "formed by the condensation, polymerization or copolymerization of organic chemicals." But there is not a scintilla of evidence in the record to show that either the bitumen (which is 70 percent by weight of the mastic) itself or the mastic as a whole was formed by any of the specified processes.

Moreover, while headnote 2, Schedule 4, Part 4A provides that the term "synthetic plastics materials" includes products "derived from" polypropylene, the mastic (which is 70 percent by weight bitumen) obviously was not derived from polypropylene.

Since the record does not establish that the mastic portion of the merchandise is a plastics material, plaintiff has failed to demonstrate that the merchandise is almost wholly of plastics within the purview of the superior heading to item 771.-42, TSUS. I further conclude that since the mastic is not plastics, as defined in

**3.** Headnote 1(vii) of Schedule 3, Part 4, Subpart C states:

1. The provisions of this subpart do not cover—

   *    *    *    *    *    *

(vii) other articles specially provided for in schedule 7 or elsewhere.

**4.** Headnote of Schedule 7, Part 12, states in pertinent part:

1. For the purpose of the tariff schedules—

   *    *    *    *    *    *

(b) the term "plastics" refers to—
(i) synthetic plastics materials as defined in parts 1C and 4A of schedule 4.

   *    *    *    *    *    *

(c) the term "rubber or plastics" means rubber, plastics, or combinations of rubber and plastics.

**5.** Headnote 2 of Schedule 4, Part 4, Subpart A, states:

2. The term "synthetic plastics materials", in this subpart, embraces products formed by the condensation, polymerization or copolymerization of organic chemicals and to which an antioxidant, color, dispersing agent, emulsifier, extender, filler, pesticide, plasticizer, or stabilizer may have been added. These products contain as an essential ingredient an organic substance of high molecular weight; are capable, at some stage during processing into finished articles, of being molded or shaped by flow; and are solid in the finished articles. The term includes, but is not limited to, such products derived from esters of acrylic or methacrylic acid; vinyl acetate, vinyl chloride resins, polyvinyl alcohol, acetals, butyral, formal resins, polyvinyl ether and ester resins, and polyvinylidene chloride resins; urea and amino resins; polyethylene, polypropylene, and other polyalkene resins; siloxanes, silicones, and other organo-silicon resins; alkyl, acrylonitrile, allyl, and formaldehyde resins; and cellulosic plastics materials. These synthetic plastics materials may be in solid, semisolid, or liquid condition such as flakes, powders, pellets, granules, solutions, emulsions, and other basic crude forms not further processed.

the TSUS, the merchandise obviously is not "wholly" of plastics by virtue of headnote 5 of the Schedule 3.

Plaintiff's contention that the merchandise should be regarded as almost wholly of plastics, because it is allegedly in chief value of plastics, is untenable. Inasmuch as the essential character of the merchandise (viz., its waterproofing capability) is not imparted by a plastics material, the merchandise cannot be regarded as "almost wholly of" plastics, irrespective of the component material of chief value. Simply put, component material of chief value is not the criterion for determining whether an article is almost wholly of a named material under General Headnote 9(f)(iii). * * *

In any event, plaintiff failed to prove the component material of chief value of the Paralon 77. It is well settled that the proper method for determining the component material of chief value is to ascertain the costs of the separate component materials at the time they have reached the state when nothing further need be done except combine them into the completed article. [Footnotes and citations omitted.]

Accordingly, the lower court dismissed the complaint.

## OPINION

### I

Nahrgang primarily argues that the imported article is almost wholly of plastics. It contends that the trial court construed the term "plastics" too restrictively in that only those articles comprised solely of plastics are considered articles of plastics. Nahrgang asserts that, in construing the phrase "almost wholly of rubber or plastics" in item 771.42, an analysis must be made not only of the completed article (mastic) but also the separate components of the mastic (polypropylene, bitumen and fabric core). As characterized by Nahrgang, this contention relies on the principles of component material of chief value analysis.

The trial court clearly and correctly held that the chief value analysis does not apply to this question. Rather, in deciding whether a material is "almost wholly of plastics," the court must determine whether the essential character of the product is imparted by plastics. See n. 6, infra. The relative value of the component parts of the product has no bearing on this analysis.

Nahrgang contends that headnote 1(c) of Part 12, Schedule 7 defines the term "rubber or plastics" to mean "rubber, plastics, or combinations of rubber and plastics." See n. 4. It then argues, citing legislative history, that the phrase "combinations of rubber and plastics" should be liberally interpreted to mean a combination of plastics with any other materials, not just a combination composed of rubber and plastics. Since the mastic in the instant case is a combination of plastics (polypropylene) with other materials, Nahrgang asserts that the mastic is within that definition. We disagree.

Nothing in headnote 1(c) indicates or even suggests that Congress intended to include within the term "plastics" anything containing materials that were not plastics. The plain meaning of the headnote is that a combination of rubber with a plastic or of two or more plastic components will still constitute a plastic. The language does not provide that combining a plastic with a nonplastic substance other than rubber will produce a plastic. Headnote 1(c) deals only with the narrow form of combination and cannot properly be read as broadly treating as plastic any combination of plastics and nonplastics.

### II

In addition to its argument that the mastic is a plastics material such that the imported article is almost wholly of plastics, Nahrgang contends that polypropylene alone imparts the essential character of the imported article, i.e., the waterproofing ca-

pability, in that it is the only component that is completely indispensible to the finished product. As such, the imported article is "almost wholly of" plastics as defined by General Headnote 9(f)(iii).[6]

It is uncertain whether Nahrgang raised that issue with sufficient specificity in the Court of International Trade to entitle it to raise the issue here. In any event, we disagree with Nahrgang on the merits.

As found by the trial court, the essential character of the imported articles is its waterproofing capability. This waterproofing capability is the result of the combination of the two essential components of the products, i.e., mastic (bitumen and polypropylene) and the Trevira fabric. The mastic, which is a mixture of bitumen and polypropylene, is 70% by weight of bitumen. Its essential character is not imparted by the polypropylene alone. The essential character of the article was addressed by several witnesses. For example, Mr. Noble, the Government's witness, testified:

Q. Do you consider the Brai product, Exhibit G, to be an effective waterproofing material?

A. Yes, I do.

Q. What component, in your opinion, gives Brai the ability to be an effective waterproofing material?

A. Asphalt, atactic polypropylene and polyester mat.

\* \* \* \* \* \*

Q. What in your opinion is the essential characteristic of Exhibit G?

\* \* \* \* \* \*

A. Essential characteristic, it's a waterproofing membrane. It *takes all*

three components to obtain that type of membrane.

\* \* \* \* \* \*

Q. Are you able to characterize the Paralon NT 4 and Paralon 77 as belonging to any particular product class or kind?

A. Yes.

Q. Please do.

A. It's modified bitumen one-ply roofing membrane.

Q. Is the product classification which you just stated similar or different to that which you gave before for the Brai SP–4 in Exhibit G?

A. It's the same. Both systems are modified bitumen atactic polypropylene. [Emphasis added.]

In addition to the fact that the essential character of the article is not imparted by the polypropylene alone, the imported articles are not considered to be plastic products even by the importer itself. This is evidenced by the fact that Nahrgang considers the imported articles as "modified asphalt membrane" and "thermoplastic resins modified asphalt" and not as plastics.

Moreover, bitumen, which is clearly not a plastic material in and of itself, has waterproofing abilities. The trial court also made the factual determination that: "The nonwoven polyester fabric core, although not waterproof in itself, contributed tensile strength essential to an effective and 'workable' waterproofing membrane."

Thus, the effective waterproofing capability of the Paralon products was accomplished by the presence of all three essential components of the Paralon products. Accordingly, the Paralon products did not obtain their essential character from the

**6.** General Headnote 9(f)(iii) states:

9. *Definitions*—For the purposes of the schedules, unless the context otherwise requires—

\* \* \* \* \* \*

(f) the terms "of", "wholly of", "almost wholly of", "in part of" and "containing", when used between the description of an article and a material (e.g., "furniture *of* wood",

"woven fabrics, *wholly of* cotton", etc.) have the following meanings:

\* \* \* \* \* \*

(iii) "almost wholly of" means that the essential character of the article is imparted by the named material, notwithstanding the fact that significant quantities of some other material or materials may be present; [Emphasis in original.]

**1368**

mastic or, for that matter, from the polypropylene plastics.

## III

Last, Nahrgang argues that the imported articles should have been classified under item 771.42 due to the principle of similitude in conjunction with an examination of the applicable legislative history. Similitude is the concept that where an article is not specially provided for elsewhere in the statute, it is properly classifiable under that item which it most closely resembles as specified in the statute. *J.E. Bernard & Co. v. United States*, 53 C.C. P.A. 116 (1966).

Since the similitude issue was not raised below, we need not and do not consider it. *International Seaway Trading Corp. v. United States*, 488 F.2d 544 (CCPA 1973).

### Conclusion

Nahrgang's claim under item 771.42, TSUS, was properly dismissed because it failed to prove that the imported articles were almost wholly of plastics as required by the superior heading to that provision. Accordingly, the judgment of the Court of International Trade is affirmed.

AFFIRMED.

JACK R. MILLER, Circuit Judge, dissenting.

I respectfully dissent in view of *Jarvis Clark Co. v. United States*, 733 F.2d 873, 878 (Fed.Cir.1984). As in *Jarvis Clark*, the trial court in this case failed to consider "whether the government's classification is correct, both independently and in comparison with the importer's alternative." *Id.* I do not agree with the majority that the trial court sustained the Customs Service classification but believe, instead, that the trial court held that the Customs Service classification was not precluded in view of the fact that appellant failed to establish its claimed classification. Accordingly, I would reverse the decision of the Court of International Trade and remand for further consideration in light of *Jarvis Clark*.