**WASHINGTON INTERNATIONAL INSURANCE CO., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Court No. 84-05-00660.**

United States Court of International Trade.

Oct. 6, 1992.

Sandler, Travis & Rosenberg, P.A., Edward M. Joffe, Miami, Fla., for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Joseph I. Liebman, Attorney-in-Charge Intern. Trade Field Office, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, John J. Mahon, Washington, D.C., for defendant.

## OPINION

AQUILINO, Judge:

This action, which has been designated a test case pursuant to CIT Rule 84(b), challenges classification by the U.S. Customs Service of imported single-ply modified bitumen roofing membrane under textile item 355.25 of the Tariff Schedules of the United States ("TSUS") (1981) ("Webs,

wadding, batting, and non-woven fabrics, including felts and bonded fabrics, and articles not specially provided for of any one or combination of these products, all the foregoing, of textile materials, whether or not coated or filled: ... Of man-made fibers"). The merchandise, bearing the tradename "Rhinohide", is a single-layer waterproofing material, which, according to a Customs analysis report, is composed (by weight) of bitumen (85.5%), ethylene-propylene (9.1%), nonwoven polyester (3.2%), grit (2.0%) and polyethylene (0.2%).[1] The plaintiff claims classification of this material under the rubber and plastics products part of TSUS Schedule 7, specifically item 771.43 ("Film, strips, sheets, plates, slabs, blocks, filaments, rods, seamless tubing, and other profile shapes, all the foregoing wholly or almost wholly of rubber or plastics: ... Other"). Classification under that item would supplant the Service's reliance on item 355.25 by operation of governing headnote 1(vii)[2] to the effect that it does not cover articles specially provided for in Schedule 7 or elsewhere.

Identical tariff provisions and similar merchandise were at issue in *V.G. Nahrgang Co. v. United States*, 6 CIT 85, *reh'g denied*, 6 CIT 210 (1983), *aff'd*, 741 F.2d 1363 (Fed.Cir. 1984). In that action, the plaintiff had also argued that its modified, single-ply roofing material was almost wholly of plastics. However, the Court of International Trade concluded that the plaintiff had failed to adduce even a scintilla of evidence to prove its claim that the mastic portion of the merchandise, a bitumen-polypropylene mixture, was a synthetic plastics material as defined in headnote 2 of Schedule 4, Part 4, Subpart A. *See* 6

CIT at 90. On appeal, Judge Miller, in dissent, agreed that lack of proof was the crux of the case[3], while the majority opinion rejected the arguments on appeal predicated as they were upon (1) chief-value analysis, (2) a contention that the polypropylene alone imparted the essential character of the merchandise and (3) an alternative view that the material should have been classified under TSUS item 771.42 per the principle of similitude. *See* 741 F.2d at 1366–68.

■ In the face of that opinion, the plaintiff endeavors to prove that Rhinohide is a plastics material within the meaning of the tariff schedules. To do so, it must demonstrate that that product is at least "almost wholly of" plastics, which, in accordance with general headnote 9(f)(iii), required that the "essential character" of the merchandise—which the parties agree is waterproofing[4]—be imparted by plastics, *viz.* the bitumen-ethylene-propylene mastic rather than by all three elements of the product, a question which the *Nahrgang* trial court explicitly did not reach. *See* 6 CIT at 92.

### I

■ Headnote 1(b) to Schedule 7, Part 12A stated that "the term *'plastics'* refers to—(i) synthetic plastics materials, as defined in parts 1C and 4A of schedule 4". Headnote 2 to that Schedule 4, Part 4A provided:

The term *"synthetic plastics materials"*, in this subpart, embraces products formed by the condensation, polymerization, or copolymerization of organic chemicals and to which an antioxidant,

---

**1.** Witnesses at the trial herein used "bitumen" and "asphalt" interchangeably. *E.g.*, Trial Transcript ("Tr.") at 70 (Herman A. Kaufman for the plaintiff), 94 (Stephen L. Patterson for the plaintiff), 159 (Steven J. Grossman for the plaintiff), 204–05 (Craig Noble for the defendant), 241 (Irving Sporn for the defendant), 288 (Russell A. Long for the defendant). "Atactic polypropylene" and "ethylene-propylene" were similarly used to describe the bitumen modifier. *See, e.g.*, Tr. at 97.

**2.** As the defendant notes, the Trade and Tariff Act of 1984, Pub.L. No. 98–573, § 111, 98 Stat.

2943, 2951–52, deleted this headnote from the TSUS, albeit "with respect to articles entered on or after the 15th day after the date of the enactment of this Act." *Id.*, § 195(a), 98 Stat. at 2972. Since the entries herein occurred before that moment, the headnote is applicable. *Cf. Elbe Products Corp. v. United States*, 11 CIT 518, 522, 670 F.Supp. 362, 365 (1987), *aff'd*, 846 F.2d 743 (Fed.Cir.1988).

**3.** *See* 741 F.2d at 1368.

**4.** *See, e.g.*, Plaintiff's Brief, p. 24; Defendant's Brief, p. 20.

**422**

color, dispersing agent, emulsifier, extender ... may have been added. These products contain as an essential ingredient an organic substance of high molecular weight; are capable, at some stage during processing into finished articles, of being molded or shaped by flow; and are solid in the finished article.[5]

With regard to the materials at issue herein, there is no dispute that the ethylene-propylene component is such a synthetic plastic. Hence, in order for the plaintiff to prevail, it must establish that bitumen is formed either by condensation, polymerization or co-polymerization, contains an organic substance of high molecular weight, is capable of being molded or shaped by flow, and is solid in its finished state.

Regarding the latter two qualities, at trial opposing expert witnesses testified that bitumen could be molded or shaped by flow and also be solid in its finished state. *See, e.g.,* Tr. 149, 162, 274. *See also* 2 Encyclopedia of Polymer Science and Technology at 402 (1970) ("Solid bitumens are plastics in that they can be formed and molded")[6]; Plaintiff's Exhibits 1–3; Defendant's Exhibit A. This ability to "soften when heated, so that they can be formed into shapes, then become rigid on cooling" is a "significant property of most plastics". 9 The New Encyclopaedia Britannica 504 (15th ed. 1986). Bitumen, in fact, was one of the first "plastics" developed. *See* 2 Encyclopedia of Polymer Science and Technology at 410–14; Tr. at 144–45, 151–52.

As for molecular weight, it is the sum of the weights of each atom[7] making up a molecule. Tr. at 32; 11 McGraw–Hill Encyclopedia of Science and Technology 339

(6th ed. 1987). Although defendant's witnesses argued that bitumen's molecular weight cannot be considered "high", each definition of bitumen presented to or considered by the court refers to it as containing substances of high molecular weight. For example, it has been defined by the American Society For Testing and Materials ("ASTM") as "a class of amorphous, black or dark-colored, (solid, semi-solid, or viscous) cementitious substances, natural or manufactured, composed principally of high molecular weight hydrocarbons". 04.04 1986 Annual Book of ASTM Standards 131. *See also* 4 1961 Annual Book of ASTM Standards 655. Similarly, volume 2 of the Encyclopedia of Chemical Technology 284 (3d ed. 1985) states that it "characteristically contain[s] very high molecular weight hydrocarbons called asphaltenes". *See* 04.04 1986 Annual Book of ASTM Standards 131 (defining asphaltene as "a high molecular weight hydrocarbon fraction precipitated from asphalt"). In short, the evidence preponderates in support of the proposition that bitumen is an organic substance of high molecular weight.

The difficult, remaining question is whether condensation, polymerization or co-polymerization occurs in that substance's formation. These phenomena can be described simply as the combining of small molecules, "monomers", into chainlike, larger molecules, "polymers". *See, e.g.,* Concise Encyclopedia of Chemical Technology 934 (1985); 15 The New Encyclopaedia Britannica 782 (15th ed. 1986). Condensation is defined by ASTM as a "chemical reaction in which two or more molecules combine with the separation of water or some other simple substance...."

---

**5.** Similarly, headnote 3 to Part 1C defined "plastics materials" as "embrac[ing] products formed by the condensation, polymerization, or copolymerization of organic chemicals and to which plasticizers, fillers, colors, or extenders may have been added."

According to an excerpt from the *Tariff Classification Study* offered by the defendant, Schedule 7's headnote "defines the term 'plastics' more broadly [than headnote 3 to Part 1C and headnote 2 to Schedule 4, Part 4A] so as to include certain natural substances as well as the synthetic substances provided for in the chemical schedule." Defendant's Brief, p. 28, quoting

the *Tariff Classification Study,* Schedule 7, p. 447.

**6.** This work points out, however, that, because of bitumen's dissimilar structural units, it "do[es] not fit the usual definition of a polymer." *See* Tr. at 40.

**7.** Atomic weight is the mass of an atom and "is approximately equal to the total number of nucleons, protons and neutrons, composing the nucleus." 11 McGraw–Hill Encyclopedia of Science & Technology 339 (6th ed. 1987).

(See also Polymerization)". 9 1961 Annual Book of ASTM Standards 797. The definition of co-polymerization refers to a polymerization reaction involving two or more monomers. *See id.* at 798, 803.

The bitumen in Rhinohide is apparently derived via two steps. *See* Tr. at 183–84, 197–98. First, in a process known as distillation or straight reduction, crude oil is heated and injected into a fractionating column, where lighter elements or "fractions" separate, leaving an asphalt residuum. *See id.* at 38, 183. *See also* 2 McGraw–Hill Encyclopedia of Science & Technology 110–12 (6th ed. 1987); 6 McGraw–Hill Encyclopedia of Science & Technology 361–66 (6th ed. 1987). Testimony as to the occurrence of condensation, polymerization or co-polymerization during this process was conflicting. One of plaintiff's experts, Dr. Grossman, for example, stated that the high temperature used in straight reduction gives "rise to reactions referred to as pyrolisis [which] refers to a high temperature bond braking and bond formation reaction." Tr. at 157–58. *See also id.* at 143, 197. Another expert for the plaintiff, Dr. Kaufman, testified that, as the molecules cool, they recombine, forming new molecules. *Id.* at 39. Defendant's witnesses, Messrs. Sporn and Long, however, argued that the isolation does not involve a chemical reaction [8], although Mr. Sporn later admitted that "bitumen may be formed in part by a condensation process" [9] and that "some low degree of polymerization or co-polymerization" was involved in its formation as well. *Id.* at 273. The second step is air-blowing [10], which

consists of dehydrogenation with concurrent formation of water as a by-product. The resulting products then combine to form compounds of higher molecular weights. The air-blowing operation is carried out in vertical or horizontal vessels provided either with direct heat or, more efficiently, with circulating tube heaters. The asphalt stocks are heated to 400–500 [degrees Fahrenheit] and contacted with large volumes of air, averaging about 20 ft$^3$/(ton) (min), which are diffused throughout the heated mass.

2 Encyclopedia of Polymer Science and Technology 406. *See also* Tr. at 107–08, 198; 3 Encyclopedia of Chemical Technology 296 (3d ed. 1985); 2 McGraw–Hill Encyclopedia of Science & Technology 112, Table 2 (6th ed. 1987). According to volume 3 of the Encyclopedia of Chemical Technology at page 299, during this process "oxygen in the air combines with the hydrogen in the asphalt to evolve water vapor", "dehydrogenation and polymerization are involved", and additional asphaltenes are formed. Although Mr. Long testified that polymerization does not occur during air-blowing, he did state that the process increases the polarity of the molecules, thus increasing intermolecular attraction, creating more of the high-molecular-weight hy-

---

**8.** *See* Tr. at 242, 296–97.

**9.** *Id.* at 247.

**10.** The government contends that the testimony presented by the plaintiff as to this procedure should be disregarded "in view of the more authoritative testimony" of Messrs. Noble and Long that the asphalt used in Rhinohide is not air-blown. Defendant's Brief, p. 32 n. 28. Those defense witnesses, however, could only state unequivocally that the material used in their product, U.S. Intec's "brai/sp–4", was not air-blown. *See* Tr. at 231, 290.

Although sold for the same purposes, their product is composed of a mastic of approximately 70% bitumen and 30% atactic polypropylene, plus a polyester liner.

Mr. Long further testified that air-blown asphalt could not be used and that he was not aware of any roofing membrane using such asphalt. Tr. at 290–91. However, Mr. Patterson, an expert witness for the plaintiff, testified that the bitumen used in roofing in this country is indeed air-blown, *id.* at 107–08, and his testimony is supported by several treatises which refer to the use of such asphalt in roofing materials. *See, e.g.,* Concise Encyclopedia of Chemical Technology 138 (1985); 2 McGraw–Hill Encyclopedia of Science & Technology 112 (6th ed. 1987) ("Air-blown asphalt is used mainly for roofs"). One source asserts, in fact, that air-blowing renders the asphalt "more resistent to weather and changes in temperature" and also that "[a]ir-blown asphalts of different viscosities and flow properties with added fillers, polymers, solvents and in water emulsions provide products for many applications in the roofing industry." 3 Encyclopedia of Chemical Technology 296 (3d ed. 1985).

drocarbons, asphaltenes, and hardening the asphalt. *See* Tr. 293–94.

To the extent that polymerization can be described as *"any* process in which relatively small molecules ... combine chemically to produce a very large chain-like or network molecule" [11], the plaintiff has demonstrated that it occurs during the manufacture of bitumen for use in Rhinohide.

In the light of the evidence at hand, the court thus concludes that the bitumen at issue herein is in fact a "synthetic plastics material" within the meaning of the tariff schedules.

## II

The crux of defendant's position thus is that Rhinohide cannot be considered an article "almost wholly of" plastics because its essential character is imparted by the nonwoven polyester liner, which is but 3.2 percent of its weight.

Bitumen, which does occur in nature, has been used as a waterproofing agent for millenia. Volume 1 of The New Encyclopaedia Britannica 637 notes, for example, that it was a "water stop" between brick walls in Pakistan around 3,000 B.C. *Compare* Tr. at 95 (technology using built-up layers of bitumen with felt for roofing is a hundred years old and still a force in the market-place); 2 Encyclopedia of Polymer Science and Technology 410 (1970). The ethylene-propylene component of the membrane adds flexibility, strength and improves quality and durability. *See* Tr. at 103, 163, 219–20. The liner also adds strength, durability and elasticity, which permit the membrane to be rolled. *Id.* at 104, 117–18, 312. And witnesses for both the plaintiff and the defendant testified that modified, single-ply bitumen roofing membranes, including some Rhinohide and a version of brai, are also manufactured with liners of fiberglass. *See id.* at 205, 227, 334–35; Plaintiff's Exhibit 6. *But see*

Tr. at 220–21. However, as has been observed in a case like this:

Discernment of the essential character of articles is not likely to develop into an exact science but, insofar as some consistency and predictability is possible, it is likely to be found in concentrating on whether the material in question supplies the distinctive feature of the article and not in examining all the characteristics of the article and, if some other material contributes important characteristics, declining to give one material the primacy which its role deserves. General headnote 9(f)(iii) acknowledges the possibility that significant quantities of some other materials may be present and implicitly recognizes that those other materials will impart something to the character of the article:

Therefore, the existence of other materials which impart something to the article ought not to preclude an attempt to isolate the most outstanding and distinctive characteristic of the article and to detect the component material responsible for that "essential characteristic."

*Canadian Vinyl Industries, Inc. v. United States,* 76 Cust.Ct. 1, 2–3, C.D. 4626, 408 F.Supp. 1377, 1378 (1976) (footnote omitted), *aff'd,* 555 F.2d 806 (CCPA 1977), quoted in *Nahrgang,* 6 CIT at 89.

While the polyester liner does add to the merchandise, the evidence adduced establishes overwhelmingly that it is the bitumen which provides the paramount characteristic of Rhinohide—waterproofing. And the court concludes that that product, including as it does the ethylene-propylene to enhance the physical characteristics of the bitumen, which together add up to 94.6 percent of its weight, can be considered "almost wholly of" plastics, correctly classifiable under TSUS item 771.43.[12] Its essence is hardly webs, wadding, batting, and non-woven fabrics, including felts and bonded fabrics, and articles not specially

---

11. 9 The New Encyclopaedia Britannica 580 (15th ed. 1986) (emphasis added).

12. Another provision referred to by the plaintiff is TSUS item 523.91 ("Articles of asphalt or tar for roofing or siding"), but the government contends that this reference is "merely a statistical breakout demonstrating one type of product".

Defendant's Brief, p. 39. Be that as it may, either primary alternative pressed now by the parties in this case prevails over that provision, as headnote 1 to Schedule 5, Part 1K provides that "[t]his subpart covers mineral substances, not provided for elsewhere in the schedules". *See V.G. Nahrgang Co. v. United States,* 741 F.2d 1363, 1368 (Fed.Cir.1984).

provided for of any one or combination of these products, all the foregoing, of textile materials, whether or not coated or filled, as claimed by Customs. In other words, this court is unable to conclude that this roofing material nevertheless lies within the ambit of the textile fibers and products contemplated by TSUS Schedule 3.

classification of the merchandise under item 355.25 of the TSUS, and judgment must therefore enter in its favor.

### III

In sum, the plaintiff has overcome the presumption of correctness of Customs