**THE MEAD CORPORATION,**
Plaintiff–Appellant,

v.

**UNITED STATES, Defendant–Appellee.**

No. 98–1569.

United States Court of Appeals,
Federal Circuit.

July 28, 1999.

Sidney H. Kuflick, Lamb & Lerch, of New York, New York, argued for plaintiff-appellant.

Amy M. Rubin, Attorney, Civil Division, International Trade Field Office, Department of Justice, of New York, New York, argued for defendant-appellee. With her on the brief were David W. Ogden, Acting Assistant Attorney General, and David M. Cohen, Director, Civil Division, Commercial Litigation Branch Department of Justice, of Washington, DC; Joseph I. Liebman, Attorney in Charge, International Trade Field Office; and William Kanter, and Bruce G. Forrest, Attorneys, Appellate Staff, Civil Division, Department of Justice, of Washington, DC. Of counsel on the brief were Allan L. Martin, Associate Chief Counsel, and Lou Brenner, Attorney, U.S. Customs Service, of Washington, DC; and Karen P. Binder, Assistant Chief Counsel, and Edward N. Maurer, Attorney, U.S. Customs Service, of New York, New York.

Terence P. Stewart, Stewart and Stewart, of Washington, DC; David Serko, Serko & Simon, LLP, of New York, New York; Richard M. Belanger, Powell, Goldstein, Frazer & Murphy, LLP, of Washington, DC; and Peter Jay Baskin, Sharretts, Paley, Carter & Blauvelt, P.C., of New York, New York, for amicus curiae Customs and International Trade Bar Association.

Before NEWMAN, RADER, and SCHALL, Circuit Judges.

RADER, Circuit Judge.

On summary judgment, the Court of International Trade affirmed the United States Customs Service's classification of day planners imported by The Mead Corporation as bound diaries. Because the terms within subheading 4820.10.20 of the Harmonized Tariff Schedules of the United States (HTSUS), namely "diaries" and "bound," do not encompass the imported articles, this court reverses.

I.

At issue are five models of Mead's day planners (model nos. 47192, 47062, 47124, 47104, and 47102). Stylistically, the day planners differ from each other based on their size (ranging from 7 ½" × 4 ⅜" to 12" × 10 ⅝"), outer jacket cover material, and type of closure. The basic model contains a calendar, a section for daily notes, a section for telephone numbers and addresses, and a notepad. The larger models contain the features of the basic model and additional items such as a daily planner section, plastic ruler, plastic pouch, credit card holder, and computer diskette holder. A loose-leaf ringed binder holds the contents of the day planner, except for the notepad, which fits into the rear flap of the day planner's outer cover.

In a January 11, 1993 ruling, Customs classified the subject planners as bound diaries under subheading 4820.10.20 (emphasis added):

4820 Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, *diaries and similar articles*, exercise books, blotting pads, binders (looseleaf or other), folders, file covers, manifold business forms, interleaved carbon sets and other articles of stationery, of paper or paperboard; albums for sample or for collections and book covers (including cover boards and book jackets) of paper or paperboard:

4820.10 Registers, account books, notebooks, order books, receipt books, letter pads, memorandum pads, *diaries and similar articles:*

4820.10.20 *Diaries,* notebooks and address books, *bound;* memorandum pads, letter pads and similar articles

Moving for summary judgment in the trial court, Mead attacked Customs' ruling on two grounds. Mead argued that (1) the articles were not diaries, and (2) the articles were not bound. Either contention, if accepted, compels classification under the "other" provision of subheading 4820.10.40. Under that subheading, Mead would owe no tariff on the imported articles, in contrast with the 4.0% tariff assessed in Customs' 1993 ruling. In support of its motion, Mead submitted dictionary definitions of the terms at issue, affidavits from seven individuals from the U.S. stationery goods industry, and affidavits from two bookbinding experts. The government cross-moved for summary judgment in support of Customs' classification, offering its own definitions of "diary" and "bound," and submitting supporting affidavits.

In a July 14, 1998 opinion (No. 98–101), the trial court granted the government's motion. The Court of International Trade broadly defined "diaries" as "articles whose principle purpose is to allow a person to make daily notations concerning events of importance." Using that definition, the trial court decided that Mead's day planners qualify as diaries even though they admittedly contain "supplementary material," that is, non-diary elements such as a section for addresses and telephone numbers. With respect to the term "bound," the trial court opined: "The common meaning of 'bound' is fastened. The irrevocability of the fastening is not important so long as it goes beyond the transitory role of packaging." Using that broad meaning for "bound," the trial court found that Mead's day planners, whose contents fit in a loose-leaf ringed binder, fall within that definition.

On appeal, Mead contests the trial court's definitions of "diaries" and "bound." Mead contends that "diaries" means: "A book for recording a person's observations, thoughts and/or events."

Mead further contends that an item is "bound" only when "permanently secured along one edge between covers in a manner traditionally performed by a bookbinder."

## II.

▉▉▉▉ This court reviews the Court of International Trade's grant of summary judgment without deference. *See Sharp Microelecs. Tech., Inc. v. United States,* 122 F.3d 1446, 1449 (Fed.Cir.1997). Where, as here, the parties do not dispute material facts regarding the imported goods, the analysis of whether the trial court properly classified the goods collapses into a determination of the proper meaning and scope of the HTSUS terms. *See SGI, Inc. v. United States,* 122 F.3d 1468, 1471 (Fed.Cir.1997).

▉▉▉▉ The Supreme Court's recent pronouncement in *United States v. Haggar Apparel Co.,* —— U.S. ——, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999) has raised questions concerning the standard of review applicable to determinations of the meaning and scope of tariff terms. *See Avenues in Leather, Inc. v. United States,* 178 F.3d 1241, 1243 (Fed.Cir.1999). The meaning of a tariff term, a matter of statutory interpretation, is a question of law. *See Bauerhin Tech. v. United States,* 110 F.3d 774, 776 (Fed.Cir.1997). Accordingly, this court has previously accorded Customs' classification rulings no deference. *See Rollerblade, Inc. v. United States,* 112 F.3d 481, 483–84 (Fed.Cir.1997). In *Haggar,* however, the Supreme Court held that if an HTSUS provision is ambiguous and Customs promulgates a regulation that "fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design," courts should give that judgment "controlling weight" as articulated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Haggar,* 119 S.Ct. at 1399. Thus this court must decide whether that deci-

sion applies in this case where Customs has not issued a regulation, but has merely issued a classification ruling implicitly interpreting an HTSUS provision. For the reasons articulated below, this court determines that *Haggar,* and thus *Chevron* deference, does not extend to ordinary classification rulings.

■ The United States Code has specifically given Customs the power to promulgate regulations. *See* 19 U.S.C. § 1502(a) (1994). Where, as in *Haggar,* Customs issues a regulation under the procedural rigors dictated by the Administrative Procedure Act, *see* 5 U.S.C. § 553 (1994), that regulation has the enforceability of law. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 295, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); Bernard Schwartz, *Administrative Law* 182–83 (3d ed.1991). A regulation, however, must first undergo a notice and comment period during which the interested public can "participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). Moreover, even after promulgation, a regulation is subject to petitions in which interested persons may seek to amend or repeal the new policy. *See* 5 U.S.C. § 553(e). A regulation that endures this process carries the full weight of Customs' rulemaking authority. *See Parker v. Office of Personnel Management,* 974 F.2d 164, 166 (Fed.Cir.1992) (recognizing that by enacting regulations, agencies put a "gloss" on their statutory interpretations). A regulation thus represents a reasoned and informed articulation of Customs' statutory interpretation, which serves to "clarify the rights and obligations of importers." *Haggar,* 119 S.Ct. at 1398.

In contrast, such procedural safeguards do not accompany typical Customs rulings.[1] The process of such rulings, for example, does not involve public debate or

discussion, but is confined to the specific facts of and parties to the particular transaction at issue. *See* 19 C.F.R. § 177.0, 177.1(a) (1998). Moreover, Customs rulings do not carry the force of law and are not, like regulations, intended to clarify the rights and obligations of importers beyond the specific case under review. Instead, a ruling merely interprets and applies Customs laws to "a specific set of facts." 19 C.F.R. § 177.1(d)(1) (defining "ruling"). These significant differences between Customs regulations and Customs rulings convince this court that *Haggar*'s reach does not extend to standard Customs rulings. Accordingly, this court continues to adhere to its precedent giving no deference to such rulings. *See Rollerblade,* 112 F.3d at 484.

In reaching this conclusion, this court also finds apt the Supreme Court's analogy in *Haggar* between trade and tax matters. *See Haggar,* 119 S.Ct. at 1400. The Supreme Court has decided that Treasury regulations interpreting tax statutes deserve deference. *See Atlantic Mut. Ins. Co. v. Commissioner,* 523 U.S. 382, 389, 118 S.Ct. 1413, 140 L.Ed.2d 542 (1998) (when a term in the Internal Revenue Code is ambiguous, "the task that confronts us is to decide, not whether the Treasury regulation represents the best interpretation of the statute, but whether it represents a reasonable one."); *see also Schuler Indus., Inc. v. United States,* 109 F.3d 753, 755 (Fed.Cir.1997). Internal Revenue Service (IRS) interpretive rulings, in contrast, "do not have the force and effect of regulations." *Commissioner v. Schleier,* 515 U.S. 323, 336 n. 8, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995). Accordingly, this court has not afforded them *Chevron* deference. *See B.F. Goodrich Co. v. United States,* 94 F.3d 1545, 1550 n. 5 (Fed.Cir.1996) ("We recognize, however, that IRS Revenue Rulings have no binding

---

1. Certain rulings—specifically, those which have the "effect of changing a practice"— undergo notice-and-comment procedures. 19 C.F.R. § 177.10(c) (1998). This case does not involve such a ruling, and this court expresses no opinion as to what level of deference, if any, would apply in that circumstance.

effect on this court."); *Trainer v. United States,* 800 F.2d 1086, 1090 n. 7 (Fed.Cir. 1986) (noting that "Treasury Regulations are of greater force and effect than Revenue Rulings.").

Customs' classifications rulings are in some ways an even less formalized body of interpretation than IRS revenue rulings. IRS revenue rulings, for example, issue from a single body—the IRS's National Office—and appear in the Internal Revenue Bulletin. *See* 26 C.F.R. § 601.201(6) (1998). Customs' rulings, in contrast, issue not only from Customs Headquarters, but from each port office of the Customs Service. *See* 19 C.F.R. § 177.2(b)(2)(ii)(B). Moreover, while Customs may publish its rulings in the Customs Bulletin, the regulations do not require it to do so. *See* 19 C.F.R. § 177.10(a). In short, the parallels between IRS Revenue Rulings and Customs rulings further convince this court that the latter, like the former, do not require *Chevron* deference.

### III.

■ This court construes a tariff term according to its common and commercial meanings, which it presumes are the same. *See Simod Am. Corp. v. United States,* 872 F.2d 1572, 1576 (Fed.Cir.1989). To ascertain the common meaning of a tariff term, this court has consulted dictionaries, scientific authorities, and other reliable information sources. *See C.J. Tower & Sons v. United States,* 69 C.C.P.A. 128, 673 F.2d 1268, 1271 (1982).

### A. Diaries

■ The trial court gleaned its broad meaning of diaries from three prior cases. In *Baumgarten v. United States,* 49 Cust. Ct. 275, 1962 WL 10886 (1962), the court considered a plastic-covered book, 4 ¼" by 7 ⅜", having pages for addresses and telephone numbers followed by ruled pages allocated to the days of the year and the hours of the day. Calendars for the current and following months headed the ruled pages. The importer invoiced the articles as "desk-diaries." In classifying them as diaries rather than as "other blank books and slate books," the court looked first to the definition of a diary in *Webster's New International Dictionary of the English Language* (2d ed. 1951): "A register of daily events or transactions; a daily record; journal; esp., a book for personal notes or memoranda, or for details of experiences or observations of the writer; also, a blank book for daily memoranda." *Id.* at 276. From this definition, the court decided:

> [T]he particular distinguishing feature of a diary is its suitability for the receipt of daily notations.... By virtue of the allocation of spaces for hourly entries during the course of each day of the year, the books are designed for that very purpose. That the daily events to be chronicled may also include scheduled appointments would not detract from their general character as appropriate volumes for the recording of daily memoranda.

*Id.*

In *Brooks Brothers v. United States,* 68 Cust. Ct. 91 (1972), the court considered an "Economist Diary," a 10" by 8" spiral bound article, covered in red leather, with fine plate-finish parchment. The importer did not dispute that the Diary was composed in part of pages suitable for use as a diary, but argued that the Diary also contained printed informational material such as maps and thus could not be classified as "Blank books, bound: Diaries." Discussing *Baumgarten,* the court noted: "Judicial authority, therefore, has adopted the crux of the lexicographic definitions that the 'particular distinguishing feature of a diary is its suitability for the receipt of daily notations.'" *Brooks Brothers,* 68 Cust. Ct. at 97. The court concluded that although the informational pages added to the usefulness or value of the article, the diary portion of the Economist Diary, "clearly 'suitable for the receipt of daily notations,'" was essential. *Brooks Brothers,* 68 Cust. Ct. at 97–98.

Finally, in *Charles Scribner's Sons v. United States*, 574 F.Supp. 1058, 6 C.I.T. 168 (1983), the court classified an "Engagement Calendar," a 9 ⅜" by 6 ½" spiral bound article with photographs on the left side and a table of the days of the week on the right, as a calendar rather than a diary. It acknowledged the *Baumgarten* and *Brooks Brothers* cases, but decided that, in contrast to a diary which is "primarily intended to be used in connection with extensive notations," the article at issue was intended only "for a notation of no more than a sentence or two." *Id.* at 175, 574 F.Supp. at 1063.

The trial court in this case relied heavily on these cases for its definition of diaries. These cases, however, involved classification of goods under tariff provisions different from those presented in this case. These prior cases therefore supply only limited guidance for this case. In *Charles Scribner's Sons*, for instance, the court decided between classifying the articles as calendars or diaries. Neither party to this case asserts that the day planners should be classified as calendars. In *Baumgarten*, the court classified the articles at issue under the Tariff Act of 1930, which as then amended provided sparse guidance under Schedule 14 ("Papers and Books"):

Blank books and slate books:

Address books, diaries, and notebooks

Other

Similarly the court in *Brooks Brothers* decided its case with similarly sparse guidance from the predecessor to tariff provision 4820.10.20 in the Tariff Schedule of the United States (TSUS):

Schedule 2. Wood and Paper; Printed Matter

Part 4. Paper, Paperboard, and Products Thereof

Subpart C. Paper and Paperboard Cut to Size or

Shape; Articles of Paper and Paperboard

Blank books, bound:

256.56 Diaries, notebooks, and address books

256.58 Other

Neither of these prior incarnations of the tariff schedule contain the specificity found in the corresponding HTSUS headings. The more precise HTSUS classification scheme, which distinguishes diaries from articles similar to diaries, necessitates a more precise definition of the terms at issue. Stated another way, while the blunt dividing line used in *Baumgarten* and *Brooks Brothers* may have sufficed to distinguish diaries from other blank books, this court must draw the line distinguishing diaries from articles similar to diaries with a finer point.

The *Oxford English Dictionary*, at 612 (1989), defines a diary as: "1. A daily record of events or transactions, a journal; specifically, a daily record of matters affecting the writer personally, or which come under his personal observation." This definition largely comports with the definition cited in *Baumgarten* and with other dictionary definitions. The *American Heritage Dictionary of the English Language*, at 516 (3d ed.1992), for example, defines a diary as: "1. A daily record, especially a personal record of events, experiences, and observations, a journal." *See also Webster's New Twentieth Century Dictionary of the English Language* at 504 (2d ed.1961) ("1. a daily written record, especially of the writer's own experiences, thoughts, etc."). These definitions reflect the two key aspects of a diary.

█ A diary must allow its user to keep a record, especially, as the Court of International Trade recognized, "concerning events of importance." Thus, a diary would include not only a factual record of the events themselves, but also a person's observations, thoughts, or feelings about them. This court disagrees with the trial court, however, that the record may be composed of the broad range of writings embraced by the term "notations." That term encompasses the use of only a word or even the briefest phrase—writings of a

length insufficient to record events, observations, thoughts, or feelings. To constitute a record at all, then, the notations must be relatively extensive. In the words of *Charles Scribner's Sons*, the article must have space for "more than a sentence or two." 574 F.Supp. 1058, 6 CIT at 175.

■ In addition, a diary must actually be a "record" in the sense that it "recalls or relates *past* events." *Webster's Ninth New Collegiate Dictionary* at 984 (1990) (emphasis added). A diarist records events, observations, feelings, or thoughts after they happen. Thus, a diary is retrospective, not prospective. A diary is not a place to jot down the date and time of a distant dentist appointment, regardless of whether that appointment would constitute an "event of importance."

Applying the above principles, the articles at issue fall into the category of articles similar to diaries (encompassed by "other" in subheading 4820.10.40) rather than as diaries under subheading 4820.10.20. As an initial matter, neither the trial court decision nor the government's brief identifies which part of the day planners they consider the diary portion. This court assumes that the court below focused on the "daily planner" section, which all five-day planner models have in common.[2] The daily planner section includes a series of pages allocated to days and numbered with the hours of the day along the left hand side of the page. Two blank lines (four shorter lines in the largest model) extend to the right of each hour. Suffice it to say that the space provided by these blank lines would not permit a diarist to record relatively extensive notations about events, observations, feelings, or thoughts. This limited space permits instead only the briefest notations. Space for only a word or phrase disqualifies these articles as diaries.

Moreover, an examination of the articles themselves reveals that the space provided

was not intended for recording past events. The top of each page carries the caption "Daily Planner" and the word "Appointments" appears above the blank lines. These pages facilitate advance planning and scheduling. As noted above, however, a diary is not for planning. Instead, a diary receives a retrospective record of events, observations, thoughts, or feelings about them. Mead markets its entire article as a "Day *Planner*," further buttressing the distinction between this prospective scheduling article and a diary. While the importer's marketing of the goods will not dictate the classification, such evidence is relevant to the determination and, in this case, weighs against classifying the articles as diaries. Indeed, the earlier trade cases—*Baumgarten* (desk-diaries); *Brooks Brothers* (Economist Diary); *Charles Scribner's Sons* (Engagement Calendar)—turned at least in part on the fact that the importers themselves regarded their articles either as diaries or as calendars. *See, e.g., Brooks Brothers*, 68 Cust. Ct. at 98 ("[T]he Economist Diary is ... by its own description a 'diary'").

### B. Bound

Reasoning that the tariff provisions at issue cover a "wide variety of book and non-book articles," the trial court eschewed the meaning of "bound" as used in the trade of book manufacturing in favor of the purported common meaning of the term. While true that heading 4820 covers book and non-book articles, the term "bound" does not appear in that heading. Rather, the term appears for the first time in subheading 4820.10.20 where it modifies "Diaries, notebooks and address books." These three items, the parties agree, are all books. Thus, the trial court's premise that the provision at issue covers non-book articles falls, as does its conclusion. Because the subheading uses the term bound in connection with types of books, this

---

**2.** To the extent the government relies on any other portion of the day planners not discussed herein, this court has considered all sections and has determined that none qualify the article as a diary.

court looks to the common meaning of that term in that context.

 *The Dictionary of Publishing,* at 43–44 (1982), defines the term "bound book" as: "Books that have been cased in, usually referring to books that have been sewn, glued, or stapled into permanent bindings." *Webster's Ninth New Collegiate Dictionary* defines "bound" as "4. *of a book:* secured to the covers by cords, tapes, or glue." All of the binding methods described in these definitions are permanent bindings. Thus, this court concludes that the term "bound," when used with reference to books as in subheading 4820.10.20, means permanently secured or fastened. In addition, affidavits from bookbinding and stationery goods experts in the record confirmed this meaning of the term "bound" in its proper context.

The Court of International Trade's definition of "bound," in contrast, essentially renders that limitation superfluous. A "bound diary" contemplates the existence of an "unbound diary." But if "bound" means fastened regardless of the permanency, what is an "unbound diary"? At oral argument, the government argued that a stack of loose-leaf pages could constitute an unbound diary. While such a stack would certainly be unbound, this court seriously questions whether it would qualify as a diary. The definition adopted in this opinion, however, leaves some meaning to the class of goods known as unbound diaries, namely, those not permanently fastened. The day planners at issue, contained in ringed loose-leaf binders, fall squarely within that class of goods.

## IV.

For the independent reasons that the subject articles are neither "diaries" nor "bound," this court reverses the trial court's classification of the goods. The goods are properly classified under the "other" subheading of 4820.10.40.

COSTS

Each party shall bear its own costs.

*REVERSED.*