**Slip Op. 00 - 112**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  RICHARD W. GOLDBERG, JUDGE**

| | |
|---|---|
| ROCKNEL FASTENER, INC.,<br><br>              Plaintiff,<br><br>         v.<br><br>UNITED STATES,<br><br>              Defendant. | Court No. 97-10-01702 |

[Plaintiff's motion for summary judgment denied.  Defendant's motion for summary judgment granted.  Judgment entered for defendant.]

Dated: August 29, 2000

Sonnenberg & Anderson (Steven P. Sonnenberg), for plaintiff.

David W. Ogden, Acting Assistant Attorney General; Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice; Amy M. Rubin, Attorney, International Trade Field Office, Commercial Litigation Branch, Civil Division, United States Department of Justice; Sheryl A. French, of counsel, Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service; for defendant.

OPINION

**GOLDBERG, Judge:** This matter is before the Court on cross-motions for summary judgment.  Plaintiff, Rocknel Fastener Inc. ("plaintiff"), challenges the United States Customs Service's ("Customs") classification of certain

fasteners as screws "[h]aving shanks or threads with a diameter of 6 mm or more" under subheading 7318.15.80 of the Harmonized Tariff Schedule of the United States (1997) ("HTSUS"). Plaintiff claims the imported fasteners should instead be classified as "[b]olts and bolts and their nuts or washers" under HTSUS subheading 7318.15.20.

The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 1581(a) (1994). For the reasons that follow, the Court grants defendant's motion for summary judgment and denies plaintiff's motion for the same.

## I.
### BACKGROUND

The merchandise at issue consists of 56[1] different industrial, externally threaded fasteners from Japan. See Pl.'s Mem. of Law in Supp. of its Mot. for Summ. J. ("Pl.'s Br."), at 1; Def.'s Mem. in Supp. of its Cross-Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Br."), at 1. The fasteners are fabricated from metal alloys, see Pl.'s

---

[1]     In their Joint Summary of Part Numbers and Entries at Issue (Oct. 27, 1999), the parties agree that 59 products are at issue. This opinion deals with 56 products, because defendant now contends that samples 2, 9, and 59 should be reclassified. See Def.'s Br., at 39 n.37, 40. Samples 2, 9, and 59 are addressed separately in the order accompanying this opinion.

Br., at 1; Def.'s Br., at 1, and are designed to hold or fasten components of a finished product together.  See Pl's Statement of Material Facts to Which There Is No Genuine Triable Issue ("Pl.'s Stmt. Mat'l Facts"), at ¶17; Def.'s Resp. to Pl.'s Statement of Material Facts as to Which There Are No Genuine Issues to Be Tried ("Def.'s Resp. to Pl.'s Facts"), at ¶17.

The fasteners are rod- or pin-shaped, and are threaded on one end.  See Pl.'s Stmt. Mat'l Facts, at ¶10, ¶12; Def.'s Resp. to Pl.'s Facts, at ¶10, ¶12.  The diameter of each fastener's threads measures six millimeters or more.  See Pl.'s Stmt. Mat'l Facts, at ¶9; Def.'s Resp. to Pl.'s Facts, at ¶9.

The fasteners also have a "head" on the end of the pin opposite the threads.  See Pl.'s Stmt. Mat'l Facts, at ¶11; Def.'s Resp. to Pl.'s Facts, at ¶11.  The fasteners were designed to be, and are installed by, torquing these heads. See Def.'s Statement of Additional Material Facts as to Which There Are No Genuine Issues to Be Tried ("Def.'s Stmt. Add'l Facts"), at ¶32, ¶33; Pl.'s Resp. to Def.'s Statement of Material Facts Not in Issue ("Pl.'s Resp. to Def.'s Facts"), at ¶32, ¶33.

Plaintiff entered the subject fasteners into the United

States between March 14, 1997 and May 7, 1997.  On August 1, 1997, Customs liquidated the fasteners under 7318.15.80 at a rate of 8.9% ad valorem.  On August 21, 1997, plaintiff filed a protest, claiming the fasteners should have been classified under  7318.15.20, subject to a duty rate of 0.3% ad valorem.  Customs denied the protest on September 18, 1997, after which plaintiff timely filed this action.

## II.
### STANDARD OF REVIEW

This case is before the Court on cross-motions for summary judgment.  Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  See USCIT R. 56(d).

The "[c]lassification of goods entails a two-step process: (1) ascertaining the proper meaning of specific terms in the tariff provision; and (2) determining whether the merchandise in question comes within the description of the properly construed terms."  Hewlett-Packard Co. v. United States, 189 F.3d 1346, 1348 (Fed. Cir. 1999).  In this case, the parties agree on the physical characteristics of the imported fasteners.  Thus, the Court must determine only "the proper meaning and scope of the relevant provisions."  Carl

Zeiss, Inc. v. United States, 195 F.3d 1375, 1378 (Fed. Cir. 1999).  Because the meaning of tariff terms is a question of law, see id., summary judgment is appropriate in this case.

In reviewing Customs's classification, the Court must determine the correct classification for the subject merchandise.  See Jarvis Clark Co. v. United States, 733 F.2d 873, 878, 2 Fed. Cir. (T) 70, 75 (1984).  Its review of Customs's classification ruling is de novo.  See 28 U.S.C. § 2640 (1994).  Ordinarily, classification rulings are entitled to a statutory presumption of correctness.  See 28 U.S.C. § 2639(a)(1) (1994).  Because the Court is faced with a question of law on motions for summary judgment, however, no presumption of correctness attaches to Customs's classification.  See Universal Elecs. Inc. v. United States, 112 F.3d 488, 492 (Fed. Cir. 1997).  In addition, the Court does not apply Chevron deference to Customs's classification rulings.  See Carl Zeiss, 195 F.3d at 1378; Mead Corp. v. United States, 185 F.3d 1304, 1307 (Fed. Cir. 1999), cert. granted,120 S. Ct. 2193 (U.S. May 30, 2000) (No. 99-1434).

## III.
## DISCUSSION

Plaintiff claims the subject fasteners should be classified as bolts under subheading 7318.15.20.  In support of its argument, plaintiff relies on general dictionary definitions and its understanding of prior case law.

Defendant asserts that the subject fasteners are properly classified as screws under subheading 7318.15.80.  As the basis for its classification, defendant relies on ANSI/ASME Standard B18.2.1 (1981) ("the Standard"), which identifies screws and bolts according to primary and supplementary design characteristics.

The starting point in every classification case is the tariff schedule.  Accordingly, the Court begins by examining the structure of the statute.  Next, the Court considers the specific tariff provisions in question, and in particular, the meaning of the tariff terms "bolt" and "screw."  After reviewing dictionary definitions, fastener industry standards, and judicial precedent, the Court concludes that the common and commercial meaning of bolt and screw is embodied by ANSI/ASME Standard B18.2.1.  Because the subject fasteners are screws as defined by the Standard, the Court concludes that Customs's classification is correct.

A.   **Congress Intended That Customs Distinguish Bolts From Screws.**

Before turning to the specific tariff terms at issue in this case, it is important to examine the structure of heading 7318. The relevant portions of Heading 7318 are:

7318           Screws, bolts, nuts, coach screws, screw hooks, rivets, cotter pins, washers (including spring washers) and similar articles, of iron or steel:
              Threaded articles:
       \*\*\* \*\*\* \*\*\*

7318.15           Other screws and bolts, whether or not with their nuts or washers:

**7318.15.20           Bolts and bolts and their nuts or washers entered or exported in the same shipment**

       \*\*\* \*\*\* \*\*\*

7318.15.40           Machine screws 9.5 mm or more in length and 3.2 mm or more in diameter (not including cap screws)

7318.15.50           Studs
       \*\*\* \*\*\* \*\*\*

                 **Other:**
7318.15.60           Having shanks or threads with a diameter of less than 6 mm
       \*\*\* \*\*\* \*\*\*

**7318.15.80           Having shanks or threads with a diameter of 6 mm or more**
       \*\*\* \*\*\* \*\*\*

7318, HTSUS (1997 ed.).

In conformance with the general organization of the tariff schedule, heading 7318 encompasses a number of like items. And like all tariff headings, heading 7318 is broken

out into six and eight digit subheadings for classification of articles thereunder. In particular, six-digit subheading 7318.15 applies to both "other screws" and "bolts." The first eight-digit provision under that subheading, 7318.15.20, applies only to bolts. For purposes of classification under 7318.15, then, Congress clearly considered bolts and screws to be different articles, and intended Customs to classify them under separate provisions. As a corollary to this, a fastener cannot be both a bolt and a screw, but must be one or the other.

**B.    The Common and Commercial Meaning of Bolt and Screw**.

Having established that Congress intended Customs to distinguish "bolts" from "other screws," the Court now turns to the meaning of those terms. Neither the HTSUS nor its legislative history define bolt or screw. Therefore, each term must be construed according to its common and commercial meaning, which are presumptively the same. See Mead Corp., 185 F.3d at 1308.

The Court may utilize a number of sources to ascertain the common and commercial meaning of bolt and screw, including dictionaries of general usage, scientific authorities, witness testimony, "its own understanding of the term," see Sabritas,

S.A. de C.V. v. United States, 22 CIT __, __, 998 F. Supp. 1123, 1127 (1998), and "other reliable information sources." Mead Corp., 185 F.3d at 1308. In cases such as this, courts often looks to industrial or commercial standards for guidance in interpreting tariff terms. See, e.g., North Am. Processing Co. v. United States, 23 CIT __, __, 56 F. Supp. 2d 1174, 1180 (1999) (deeming USDA regulations "persuasive" support for the common and commercial meaning of "meat"); THK America, Inc. v. United States, 17 CIT 1169, 1174, 837 F. Supp. 427, 432 (1993) (consulting American National Standard AFBMA Standard Terminology for Antifriction Bearings and Parts for the common and commercial meaning of "ball bearing"); Washington Int'l Ins. Co. v. United States, 16 CIT 873, 875, 803 F. Supp. 420, 422 (1992) (consulting American Society for Testing and Materials standards to define various headnote terms), aff'd 24 F.3d 224 (Fed. Cir. 1994); see also Arthur J. Humphreys, Inc. v. United States, 973 F.2d 1554, 1559 (Fed. Cir. 1992) (stating that "[i]ndustrial or commercial standards are useful in ascertaining the commercial meaning of a tariff term").

**1. ANSI/ASME Standard B18.2.1 Embodies the Common and Commercial Meaning of Bolt and Screw.**

The Court first looks to dictionaries for the common and commercial meaning of the term bolt. Most generally,

Webster's New World Dictionary defines bolt as "a threaded metal rod or pin for joining parts, having a head and usually used with a nut."  157 (3d ed. 1988).  Similarly, Millwrights and Mechanics Guide describes a bolt as "an externally threaded fastener designed for insertion through holes in assembled parts. . . . [that] is normally tightened and released by turning a mated nut."  Pl.'s Br., at 12 (quoting Millwrights and Mechanics Guide 371 (4th ed. 1986)).  The American Heritage Dictionary of the English Language defines bolt, in greater detail, as "[a] fastener consisting of a threaded pin or rod with a head at one end, designed to be inserted through holes in assembled parts and secured by a mated nut that is tightened by applying torque."[2]  213 (3d ed. 1996).  Finally, the McGraw-Hill Concise Encyclopedia of Science & Technology defines bolt as

> A rod, usually of metal, with a head at one end and a screw thread on the other.  A bolt is used to fasten objects together.  A bolt is passed through clearance holes in two or more parts, a nut is engaged on the threaded end, and the parts are drawn together.

_____

[2]    Similarly, Webster's II New Riverside University Dictionary defines bolt as "[a] fastener having a threaded pin or rod with a head at one end, designed to be inserted through holes in assembled parts and secured by a mated nut that is tightened by application of a torque."  Def.'s Br., Campanelli Decl., ¶10 (quoting Webster's II New Riverside University Dictionary 188 (1984)).

264 (2d ed. 1989).

In broad terms, these definitions suggest that a bolt is designed to function in the following manner: (1) it is inserted into a preexisting hole, (2) a nut is joined on the end, and (3) the nut is turned, such that it compresses together the parts to be joined. At the very least, the characteristic identified by every one of the foregoing definitions is that a bolt is normally meant to be used with a nut. Plaintiff cautions, however, that "there is no requirement that a bolt be used with a nut." Pl.'s Br., at 11. In plaintiff's view, a bolt is simply "a rod which [sic] fastens two or more objects together." Pl.'s Br., at 9.

Turning to the tariff term "screw," Webster's New World Dictionary defines it as "a mechanical device for fastening things together, consisting essentially of a cylindrical or conical piece of metal threaded evenly around its outside surface with an advancing spiral ridge and commonly having a slotted head: it penetrates only by being turned, as with a screwdriver." 1206. Similarly, The American Heritage Dictionary of the English Language defines screw as "a. A cylindrical rod incised with one or more helical or advancing spiral threads . . . 2. A metal pin with incised threads and

broad slotted head that can be driven as a fastener by turning with a screwdriver . . . ."  1622 (3d ed. 1996).  Finally, Millwrights and Mechanics Guide states that "[a] screw is supposed to mate with an internal thread into which it is tightened or released by turning its head."  Pl.'s Br., at 12 (quoting Millwrights and Mechanics Guide 371 (4th ed. 1986)). Plaintiff offers no definition for the common and commercial meaning of the term screw.[3]

Based on the foregoing dictionary definitions, it appears that bolts and screws are designed to perform their fastening function in different ways: bolts by torquing a nut, and

---

[3]     The source of plaintiff's complete neglect of the term screw may be its reliance on its assertion that 7318.15.80 is a "basket" provision that is, by definition, subordinate to 7318.15.20, an eo nomine provision. Plaintiff asserts that because the subject fasteners fall within a broad definition of the term "bolt," and because the provision for bolts, 7318.15.20, is more specific than 7318.15.80, the fasteners must be classified as bolts under 7318.15.20.  See Pl.'s Br., at 6-7.

Because bolts must be distinguished from other screws for purposes of classification under subheading 7318.15, whether 7318.15.80 is an eo nomine or basket provision is irrelevant. If a fastener is a bolt, it must be classified under 7318.15.20, the eo nomine provision for bolts.  If a fastener is not a bolt, however, it cannot be classified under 7318.15.20 under any circumstances; it must be classified elsewhere under subheading 7318.15.  This is true regardless of whether the alternative provisions under 7318.15 are eo nomine or basket provisions.  Thus, even assuming plaintiff is correct in asserting that 7318.15.20 takes precedence over 7318.15.80, it is of no consequence.

screws by torquing the head.  According to plaintiff, however,

> [f]rom a common meaning standpoint, it is
> irrelevant whether the subject merchandise
> is used with a nut or whether it is driven
> by the head.  The common meaning of the term
> "bolt" includes such fasteners regardless of
> whether they are used with a nut, as
> indicated by the explanation that bolts are
> usually, but not always, required to be so
> used.  It is also evident that screws may be
> used with nuts, and still remain "screws."

Pl.'s Br., at 12 (citations omitted).  To illustrate this

point, plaintiff offers a quote from Millwrights and Mechanics

Guide.

> The bolt is described as an externally
> threaded fastener designed for insertion
> through holes in assembled parts.  It is
> normally tightened and released by turning a
> mated nut.  A screw differs from a bolt in
> that it is supposed to mate with an internal
> thread into which it is tightened or
> released by turning its head.  These
> definitions obviously do not always apply,
> since bolts can be screwed into threaded
> holes and screws can be used with nuts.

Id.  (quoting Millwrights and Mechanics Guide 371 (4th ed.

1986)).

     Plaintiff's observation that common definitions of bolt

and screw are often inconsistent or ambiguous and obscure the

distinction between the two fasteners is well taken.  In order

to classify the fasteners at issue then, the Court must look

to more precise sources, to foreclose the ambiguities latent

in dictionary definitions.  See <u>United States v. Spiegel Bros.</u>

<u>Corp.</u>, 51 C.C.P.A. 69, 73 (1964) (consulting a "more precise

source[]" for the common meaning of pliers); <u>see also</u> <u>Marcor</u>

<u>Dev. Corp. v. United States</u>, 20 CIT 538, 547, 926 F. Supp.

1124, 1134 (1996) (rejecting vague or overly broad dictionary

definitions as common meaning).  Accordingly, the Court turns

to fastener industry standards for bolts and screws.

ANSI/ASME Standard B18.2.1 provides a well-recognized,

comprehensive basis for the common and commercial meaning of

bolt and screw.  It defines a bolt as "an externally threaded

fastener designed for insertion through holes in assembled

parts, and is normally intended to be tightened or released by

torquing a nut."  Def.'s Br., Ex. A (ANSI/ASME B18.2.1), ¶2.1.

The same Standard defines screw as "an externally threaded

fastener capable of being inserted into holes in assembled

parts, of mating with a preformed internal thread or forming

its own thread, and of being tightened or released by torquing

the head."  <u>Id.</u> ¶2.2.  These definitions of bolt and screw

reflect the commonalities of the dictionary definitions of

bolt and screw noted previously by the Court.[4]

---

[4]    The Standard's definitions are also consistent with
Harmonized Commodity Description and Coding System Explanatory
Note 73.18(A) (2d ed. 1996), which states that "[a] bolt is
designed to engage in a nut, whereas screws for metal are more

The Standard's primary and supplementary criteria put a finer point on the foregoing definitions.  The criteria focus on design characteristics; that is, bolts and screws are identified based on their physical properties for use, not the manner in which they are actually used.  See id. ¶3 (stating that a fastener that has a majority of specified design characteristics is a screw "regardless of how it is used in its service application").  Under the Standard, then, the issue is not whether a fastener is ultimately screwed into threaded holes or used with a nut, but whether it is designed to be screwed into threaded holes or used with a nut.

Defendant relies on ANSI/ASME Standard B18.2.1 as the common and commercial meaning of bolt and screw.  Defendant's

---

usually screwed into a hole tapped in the material to be fastened."  The Court may consult the Explanatory Notes to determine the common meaning of tariff terms because while they "do not constitute controlling legislative history . . . [they] nonetheless are intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting subheadings."  Mita Copystar Am. V. United States, 21 F.3d 1079, 1082 (Fed. Cir. 1994).

    Interestingly, Explanatory Note 73.18(A) states that screws are "generally threaded throughout their length whereas bolts usually have part of the shank unthreaded."  That distinction is not made in any of the dictionary definitions surveyed by the Court, nor do the parties argue this point.  The Court thus simply notes that many of the fasteners at issue are threaded along their entire length while the body (unthreaded portion) of others is large relative to the threaded portion of the shank.

affiants refer to it variously as "the recognized standard in the United States," Def.'s Br., Vass Decl., ¶15 (Affidavit of Steven Vass, Product Engineering Manager for Lake Erie Screw Corporation and Chairman of the ANSI/ASME B18.2 Committee for Externally Driven Fasteners), and "the national consensus standard." Def.'s Reply Br., Wilson Decl., ¶3 (Affidavit of Charles J. Wilson, Director of Engineering, Industrial Fastener Institute). Plaintiff acknowledges that "ANSI/ASME standards are recognized and adopted as American National Standards." Pl.'s Br., at 22.

According to defendant's affiants, ANSI/ASME Standard B18.2.1 "is in wide use in all areas of American industry." Def.'s Br., Hubbard Decl., ¶8 (Affidavit of John Hubbard, engineering manager for Rockford Fastener, Inc. and chairman of the Industrial Fastener Institute Small Products Engineering Committee); see also Def.'s Br., Vass Decl., ¶15. The Standard is published by the Industrial Fasteners Institute (IFI) in its Fastener Standards handbook,[5] which the preface describes as "a 'BIBLE' for designers, manufacturing engineers, and managers in all industries." Def.'s Br., Ex.D

---

[5]     Customs also publishes this standard in its handbook "What Every Member of the Trade Community Should Know: Distinguishing Bolts From Screws." See Def.'s Br., Ex. B, 2 - 11.

(preface to <u>Fastener Standards</u> (6th ed.)).

In sum, all of defendant's affiants believe the ANSI/ASME Standard B18.2.1 "reflect[s] the common and commercial understanding of the terms bolts and screws, as well as the common and commercial understanding of the distinctions between bolts and screws."  Def.'s Br., Vass Decl., ¶16; <u>see also</u> Def.'s Br., Hubbard Decl., ¶7.  And, while plaintiff's affiants contend that the subject fasteners are bolts, none of them dispute that ANSI/ASME B18.2.1 is the prevailing standard in the United States for bolts and screws.[6]

Furthermore, ANSI and ASME's expertise in the field of fasteners is well-recognized.  <u>See, e.g.,</u> <u>Hafele Am. Co. v. United States</u>, 18 CIT 1096, 1098, 870 F. Supp. 352, 355 (1994) (citing ANSI/ASME Standard B18.2.1 for the meaning of screw); <u>S.I. Stud, Inc. v. United States</u>, 17 CIT 661, 669-70 (1993)

_____

[6]    Plaintiff's affiants do not refute that ANSI/ASME B18.2.1 is the national standard for bolts and screws, nor do they claim that (1) according to the Standard, all of the subject fasteners are bolts; or that (2) the subject fasteners are known as bolts throughout the fastener industry.  The sum and substance of the affidavits offered by plaintiff is that Rocknel, its Japanese vendor, and Rocknel's customers (Japanese automakers),  refer to the subject fasteners as bolts in their purchase orders, specifications, and manuals. <u>See, e.g.,</u> Pl.'s Br., Vaughn Decl. (Purchasing Manager, Rocknel Fastener, Inc.); Pl.'s Br., DeRango Decl. (Sales Manager, Rocknel Fastener, Inc.).  As plaintiff acknowledges, such evidence is "not necessarily controlling."  Pl.'s Br., at 21.

(relying on the American Society of Mechanical Engineers
(ASME) American Standard Glossary of Terms for Mechanical
Fasteners, ASA B18.12 (1962) to determine whether fasteners
were bolts or studs), aff'd 24 F.3d 1394 (Fed. Cir. 1994);
Advel Corp. v. United States, 73 Cust. Ct. 200, 204 (Cust. Ct.
1974) (referring to ASME's Glossary of Terms for Mechanical
Fasteners as an "authoritative technical source[]" for the
common meaning of rivets).  For all of these reasons, the
Court finds that ANSI/ASME B18.2.1 embodies the common and
commercial meaning of the terms bolt and screw.

> **2.      Plaintiff's Objections to Customs's
>          Classification Fail.**

Plaintiff argues that the common and commercial meaning
of bolt and screw cannot be derived from ANSI/ASME Standard
B18.2.1 for several reasons.  Plaintiff insists that the
common and commercial meaning of bolt and screw be derived
from dictionary definitions alone.  Plaintiff also argues that
ANSI/ASME B18.2.1 is the equivalent of a commercial
designation that must be definite, uniform and general, that
the Standard is outdated, and that it is inapplicable because
the subject fasteners are custom-made and used in automobiles.

### a.    Plaintiff's proffered definition for bolt is unacceptably vague.

Plaintiff argues that the common meaning of bolt must be ascertained from dictionaries of general use.  Plaintiff cites Webster's Third New International Dictionary, which defines bolt as "[a] rod or heavy pin (as one made of steel) designed to fasten two or more objects (as metal plates) together and hold one or more objects in place often having a head at one end and a screw thread cut upon the other end and being usu. secured by a nut or by riveting."  Pl.'s Br., at 9 (quoting Webster's Third New International Dictionary [no page specified] (1986)).  Similarly, plaintiff cites another dictionary that defines bolt as "a stout metallic pin used for holding objects together, frequently screw threaded at one extremity to receive a nut."  Pl.'s Br., at 9 (quoting Lexicon Webster Dictionary 110 (1983)).  Plaintiff claims that taken together with similar definitions, these definitions establish that a bolt is "a rod which [sic] fastens two or more objects together."  Pl.'s Br., at 9.[7]  Plaintiff's experts offer no definition for the term bolt.  And, as previously noted,

_____

[7]    Plaintiff also phrases its definition of bolt as a "rod or pin-shaped object with a head on one end and which is designed to fasten objects in place (or together)."  Pl.'s Br., at 11.

plaintiff offers no definition for the term screw.

Plaintiff reduces its dictionary definitions almost to the point of abstraction,[8] such that its definition for bolt is overly broad and ambiguous. For purposes of illustration, its definition of bolt is "a rod which fastens two or more objects together." Pl.'s Br., at 9. Yet, that definition encompasses screws as well; in simplest terms they, too, are rods that fasten things together. See, e.g., American Heritage Dictionary of the English Language 1622 (3d ed. 1996) ("A metal pin. . . that can be driven as a fastener.").

Clearly, accepting a definition of bolt as broad as that urged by plaintiff would create conflict between 7318.15.20 and other provisions under subheading 7318.15. Subheading 7318.15 applies to both screws and bolts. Under plaintiff's urged definition of bolt, however, any rod-like object that fastens things together would be classified under 7318.15.20, including screws. In that case, the "[o]ther" provisions of 7318.15 -- 7318.15.60 and 7318.15.80 -- would be serve no function and be completely superfluous. And it is axiomatic in Customs law, and indeed all statutory construction exercises, that a court not interpret one provision of a

_____

[8]     Interestingly, plaintiff eschews any mention of a nut, even though both of its definitions do so.

statute as to render meaningless another.  See Dow Chem. Co.
v. United States, 10 CIT 550, 552-53, 647 F. Supp. 1574, 1578
(1986) (refusing to interpret a tariff provision so as to
render superfluous or partially nullify other provisions).
Thus, plaintiff's proposed definition of bolt must fail.

Plaintiff contends, nonetheless, that "the essence of"
its formulation for the common and commercial meaning of bolt
has been adopted by the court in prior cases.  See Pl.'s Br.,
at 10.  The majority of the cases cited by plaintiff are not
persuasive in this case, however, because they do not
elucidate the meaning of bolts vis a vis screws; instead,
those cases discuss bolts in comparison with other types of
merchandise.

For example, plaintiff cites S.I. Stud.  Like the instant
case, the merchandise at issue was fasteners imported from
Japan.  See 17 CIT at 661.  Unlike this case, however, the
court was faced with a choice, not between bolts and screws,
but bolts and studs.  Thus, the court did not have occasion to
consider bolts, as relevant to this case, in relation to
screws.[9]

---

[9]     Similarly, the court in A.L. Liebman & Son, Inc. v.
United States chose between bolts and anchors, not bolts and
screws.  65 Cust. Ct. 85 (1970).

It is notable, however, that in finding that the fasteners were studs,[10] the S.I. Stud court rejected the "broad" definition of bolt proffered by plaintiff in that case. See id. at 664. And given the "overlap between" the definitions of bolt and stud in "general purpose dictionaries," the court "place[d] greater emphasis on . . . technical sources." Id. at 669. One of the technical sources relied on by that court was a publication of the American Society of Mechanical Engineers, one of the organizations responsible for ANSI/ASME Standard B18.2.1. See id. at 669-70.

Plaintiff's citation to Atlas Copco N. Am., Inc. v. United States is also inapt in that the court considered bolts in the context of merchandise other than screws. 17 CIT 1163, 837 F. Supp. 423 (1993). That case involved a unique item known as a Swellex bolt. Plaintiff argued that Swellex bolts should be classified under the provision for bolts, but Customs classified them instead as "articles of iron or

_____

[10]    The court found that the fasteners were studs, in large measure, based on the difference in "shape or configuration" of the fasteners. S.I. Stud, 17 CIT at 664. The studs were threaded at both ends, had no head, and were used to fasten items together with nut at each end. See id. at 662. The Court observes that even the studs at issue in S.I. Stud would fall within plaintiff's proffered definition of bolt as a "rod which fastens two or more objects together".

steel." In analyzing whether the Swellex bolts were "bolts" or "other articles of iron or steel," one of the main issues facing the Atlas Copco court was whether, under the precursor to the HTSUS, the TSUS, a non-threaded object could be classified as a bolt. See Atlas Copco, 17 CIT at 1166, 837 F. Supp. at 425. The court's discussion regarding legislative intent and the characteristics of bolts is, for that reason, completely inapplicable to the controversy before the Court; heading 7318 of the HTSUS is divided into threaded and non-threaded articles, and the provisions for both screws and bolts are threaded articles. Thus, under the current provisions, a non-threaded fastener could never be classified as a bolt.

Finally, plaintiff cites Hafele to support its broad definition for bolt. Hafele is the most relevant of plaintiff's citations in that it involves the same tariff provisions at issue here; Customs classified the merchandise as a screw under 7318.15.80 and plaintiff argued the merchandise should instead be classified as a bolt under 7318.15.20.

The Hafele court determined that the merchandise in that case was bolt. The broad dictionary definitions cited for the term "bolt" in that case are not instructive here, however.

In Hafele, the court first considered whether the merchandise was a screw.  In that case, it was "undisputed that the subject merchandise does not accomplish its primary purpose [of fastening other objects together] upon having its head torqued."  Hafele, 18 CIT at 1098, 870 F. Supp. at 355.  The court stated that "the merchandise must mate with a cam in order to accomplish its purpose . . . the cam is then tightened and locked by torquing the cam, not by torquing the head of the merchandise."  Id.  In effect, the Court found that the fastener at issue was not a screw because it was not designed to be torqued by its head to fasten things together.

Notably, the court relied on ANSI/ASME Standard B18.2.1. (1981), the same standard invoked by defendant in this case, in its analysis.  See id.  Only after having determined that the merchandise was not a screw did the court find that it fit within broad dictionary definitions of bolt similar to those cited by plaintiff.  In contrast, in this case, it is undisputed that the fasteners were designed to be, and in fact are installed by, torquing their heads.  See Def.'s Stmt. Add'l Facts, at ¶32, ¶33; Pl.'s Resp. to Def.'s Facts, at ¶32, ¶33.  Due to this factual distinction, plaintiff's reliance on the broad dictionary definitions of bolt is misplaced.

### b. Plaintiff's objections to Standard B18.2.1 are without merit.

Plaintiff argues that Standard B18.2.1 cannot be used to inform the common and commercial meaning of tariff terms, and in any event is not applicable to its fasteners.  Plaintiff argues that (1) the Standard is a "technical" meaning that must be definite, uniform, and general throughout the trade, (2) Congress did not explicitly adopt the standard in the HTSUS, (3) the Standard is not applicable because it is a U.S. standard and the fasteners are manufactured in Japan, and that (4) with particular respect to the automotive industry, the Standard is outdated.  Plaintiff's objections are without merit.

First, plaintiff asserts that ANSI/ASME Standard B18.2.1 is a technical standard that differs from the common and commercial meaning of bolt and screw.  See Pl.'s Br., at 19-20.  According to plaintiff, this "technical definition" is "equated with a proffered commercial designation" that defendant must demonstrate is definite, uniform, and general throughout the trade.  Pl.'s Br., at 20.  Plaintiff also argues that Congress did not include ANSI/ASME Standard B18.2.1 in the notes or otherwise refer to it in the HTSUS, and therefore that "the standard should be ignored for

classification purposes." Pl.'s Br., at 20.

Plaintiff is wrong on both points. Standard B18.2.1 is not a commercial designation; the court has consulted standards promulgated by ANSI, ASME, and many other standard-making bodies in numerous cases to inform the common and commercial meaning of tariff terms. See introduction to Section B, supra. The court has done so even when such standards were not explicitly part of the HTSUS.

Plaintiff also "questions the applicability of ANSI/ASME B18.2.1 (1981) to the subject imported fasteners" because the fasteners were manufactured according to Japanese, not American, specifications. Pl.'s Br., at 22. Plaintiff is patently mistaken. First, the ANSI/ASME Standard B18.2.1 is a methodology for distinguishing between bolts and screws, not specifications for the length, diameter, size of head, etc., of particular bolts and screws. Therefore, that the subject fasteners were manufactured to fit into Japanese cars is irrelevant to the applicability of ANSI/ASME Standard B18.2.1. Second, under the HTSUS, goods are classified within the meaning of the tariff terms as understood in the United States, not the county of exportation. See Hismoco (Am.) Co. v. United States, 81 Cust. Ct. 32, 34 (1978) (assessing whether the merchandise at issue was within the common meaning

of "'dried prunes' as that term is used in the commerce of the United States); <u>Buchanan Elec. Prods. Co. v. United States</u>, 65 Cust. Ct. 570, 577 (1970) (finding the merchandise was "tubes" as commonly known in the United States); <u>Ziel & Co. v. United States</u>, 53 Cust. Ct. 164, 166 (1964) (rejecting claim that kiwi fruit was within the common meaning of "berries" as the term is used in the United States); <u>Wing Coffee Co. v. United States</u>, 53 Cust. Ct. 60, 63 (1964) (finding that larm are not olives as commonly known in the United States). Thus, the fasteners at issue cannot be classified according to Japanese convention.[11]

Finally, plaintiff complains that, in relation to the automotive industry standards and techniques, ANSI/ASME B18.2.1 is outdated and ambiguous. According to plaintiff, "[t]he manufacturing process in various fields has . . . evolved to the point that, even when used with a nut, bolts are driven by the head." Pl.'s Br., at 24. In such cases,

---

[11] Plaintiff also notes that "[t]he subject fasteners are designed in terms of 'metric' measurements (i.e., measured in millimeters), as opposed to English measurements." Pl.'s Br., at 2. This is irrelevant. First, 7318.15.80 is expressed in millimeters: "Having shanks or threads with a diameter of 6 mm or more." Moreover, ANSI/ASME Standard B18.2.1 is equally applicable to metric fasteners. <u>See</u> Def.'s Br., Vass Decl., Ex. B (<u>Metric Fastener Standards</u> (2d ed. 1983)).

"the nuts are already welded into place and the bolts must be driven by their head in the assembly."[12]  Id.  In plaintiff's view, because some of the subject fasteners are used with nuts in this manner, ANSI/ASME B18.2.1 is inapplicable to the automotive industry.

Plaintiff is incorrect for a number of reasons.  First, ANSI/ASME Standard B18.2.1 is reviewed by the American Society of Mechanical Engineers (ASME) every five years.[13]  See Def.'s Br., at 18 and n.19.  And, the Standard was approved by ANSI in December, 1996.  See Def.'s Br., Vass. Dec., Ex. E (1999 Foreword to ASME B18.2.1).  Importantly, according to Charles J. Wilson, Director of Engineering at the Industrial Fasteners Institute, General Motors, Ford Motor Company, Chrysler Corporation, and other automotive companies helped formulate ANSI/ASME B18.2.1 and have been and continue to be

---

[12]    If the design and manner of use of screws and bolts has evolved to the point where they are indistinguishable from one another, the most appropriate forum to make this argument is before Congress, which has the authority to revise the HTSUS.

[13]    "According to the bylaws of ASME, standards are reviewed every five years.  Depending on the outcome of that review, the standard must be reaffirmed, meaning no changes are required, revised, or withdrawn (canceled) if there is evidence that the standard is not being used."  Def.'s Br., Vass Decl., ¶16.  Thus, although it appears that the Standard has not been revised since 1981, it has been reviewed several times since then.

participants in the B18 Standards Committee.  See Def.'s Reply Br., Wilson Decl., ¶4; see also Def.'s Br., Vass Decl., Ex. I (ASME Standards Committee B18).  And, ASME membership includes both manufacturers and users.  See Def.'s Br., Vass Decl., ¶16.  These facts mitigate against plaintiff's claim that the standard is outdated with respect to the automotive industry, or not in accordance with its manufacturing processes.  And at oral argument on June 6, 2000, plaintiff could not identify specific changes in manufacturing processes or the design of fasteners in the last thirty years to counter defendant's classification.

Second, plaintiff does not dispute that the subject fasteners are properly classified under Heading 7318.  The articles contained within heading 7318 are "parts of general use."[14]  Section XV, Note 2(a), HTSUS (1997). As such, they are not classified according to a particular industry.[15]  Cf. Item

---

[14]     Parts of general use, such as the articles of heading 7318, are specifically exempted from classification under the chapter for vehicles.  See Section XVII, Note 2(b), HTSUS (1997).

[15]     In fact, in addition to the automotive industry, the American National Standards Committee B18 included representatives from the hardware, engine manufacturing, anti-friction bearing manufacturing, agricultural, metal cutting tool, hand tool, farm & industrial equipment, elevator, telephone, and electrical manufacturing industries, as well as the Navy, Army, Air Force and Department of Defense.  See

8708.40.20 (applicable to gear boxes as known in the motor

vehicle (designed for transport of persons) industry).  Thus,

contrary to plaintiff's position, ANSI/ASME Standard B18.2.1

is no less applicable because plaintiff's fasteners – parts of

general use – are used in the automotive industry.[16]

    Third, plaintiff admits that 7318.15 is neither an actual

use nor a principal use provision.  See Def.'s Stmt. Add'l

Facts, ¶2, ¶3; Pl.'s Resp. to Def.'s Facts, ¶2, ¶3.  And

generally, use is not considered unless use is part of the

_____

Pl.'s Br., Seirig Decl., Ex. D (roster of committee
personnel).

    [16]    Thus, the testimony of Ali A. Seirig, Professor in
the Department of Mechanical Engineering of the University of
Wisconsin-Madison, that the Standard "bears little relation to
how those terms [bolt and screw] are used in applications in
various industries, including the automotive and aerospace
industries" misses its mark.  Pl.'s Br., Seirig Decl., ¶9.
Moreover, Professor Seirig does not express a belief that the
subject fasteners are bolts.  He only states that, in his
view, "the main distinguishing characteristic between a bolt
and a screw would be the fastener's ability to bore a hole, or
create mating threads in a material.  From my review of the
products in Exhibit A, none appear to meet this basic
requirement of a screw."  Id. at ¶11.
        It is worth noting that, with respect to the ability
to bore a hole, that Explanatory Note 73.18(A) distinguishes
between "[b]olts and screws for metal" and "[s]crews for
wood," which would be classified under 7318.12.  According to
the Note, the former "are rarely pointed."  The latter,
however, "differ from bolts and screws for metal in that they
are tapered and pointed, and they have a steeper cutting
thread since they have to bite their own may into the
material."

definition of the classification or use is otherwise suggested. See North Am. Processing, 23 CIT at __, 56 F. Supp. 2d at 1180 (citing Ruth Sturm, Customs Law & Administration § 53.2 (Supp. 1995)). Thus, that the subject fasteners are ultimately used in the assembly of automobiles has no bearing on the common and commercial meaning of bolt and screws, nor does it vitiate ANSI/ASME Standard B18.2.1's applicability. Cf. Carl Zeiss, 195 F.3d at 1379 (refusing to narrow a provision for microscopes to only those used in research and industry because "a use limitation should not be read into an eo nomine provision unless the name itself inherently suggests a type of use"). And if Customs took into account how different fasteners of general use were actually used in different industries to determine whether they were bolts or screws, classification would be inconsistent and therefore counter to the principle underlying the tariff classification system. See Henry Dickens Rowley v. United States, 68 Cust. Ct. 117, 122 (1972) (calling "[u]niformity of tariff classification, an important tariff principle").

Moreover, although plaintiff's customers use the subject fasteners for assembly of the engine, suspension, and body of automobiles, the fasteners are not limited to use in those areas only. See Pl.'s Br., at 2; see also Pl.'s Br., Higuchi

Decl., ¶12 (stating that the subject fasteners are used in the engine wire harness assembly, oil pump, oil pan assembly, clutch, accumulator body, regulator, servo body, exhaust pipe, fuel pipe, radiator, navigation (GPS) system, antilock brake system, windshield washer, radio speakers, rear brake, cruise control, brake master cylinder, suspension, shift lever, console, seats, doors, sunroof, and trunk lid).  And "[s]ervice applications for the same fastener may vary." Def.'s Stmt. Add'l Facts, ¶11, Pl.'s Resp. to Def.'s Facts, ¶11.  The subject fasteners are not limited to use in automobiles either, but can be used in a variety of other industries.  See Pl.'s Br., at 1 (stating that the subject fasteners may also be used in the manufacture of motorcycles); Tr. of Oral Argument of 10/27/99, at 8-9 (representation by counsel for plaintiff that the subject fasteners can be used in other industries).

In conclusion, plaintiff's objections to ANSI/ASME Standard B18.2.1 are without merit.  As stated, the Standard is the common and commercial meaning of bolt and screw as understood by the fastener industry in the United States.

C.   __The Subject Fasteners are Screws__.

The Court has determined that under ANSI/ASME Standard B18.2.1, "[a] screw is an externally threaded fastener capable of being inserted into holes in assembled parts, of mating with a preformed internal thread or forming its own thread, and of being tightened or released by torquing the head." Def.'s Br., Ex. A, ¶2.2.  Plaintiff does not dispute that "[t]he Samples, Drawings, and/or Manuals provided by Rocknel indicate that the imported fasteners were designed to be installed in holes of assembled parts by turning the heads of the fasteners to mate with preformed internal threads or form their own threads, and by turning the heads to tighten or release."[17]  Def.'s Stmt. Add'l Facts, ¶32; Pl.'s Resp. to Def.'s Facts, ¶32.

Further, under ANSI/ASME Standard B18.2.1,

> [a] bolt is designed for assembly with a nut.  A screw has features in its design which makes [sic] it capable of being used in a tapped or other preformed hole in the work.  Because of basic design, it is possible to use certain types of screws in combination with a nut.  Any externally threaded fastener which has a majority of the design characteristics which assist its proper use in a tapped or other preformed

---

[17]    Plaintiff "[d]enies that nuts are equated with preformed internal threads" but "[a]dmits in other respects." Pl.'s Resp. to Def.'s Facts, ¶32.

hole is a screw, regardless of how it is
used in service application.

Def.'s Br., Ex. A, ¶3 (Explanatory Data).  In characterizing the subject fasteners as screws, defendant found that the fasteners met at least five of the Standard's nine supplementary design criteria for screws.  Plaintiff has not submitted evidence to dispute this finding.  Nor has plaintiff argued in sufficient detail that under ANSI/ASME Standard B18.2.1, the subject fasteners are bolts.  Accordingly, the subject fasteners are screws.

## IV.
## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment and denies plaintiff's motion for summary judgment.  A separate Order will be entered accordingly.

_____
                     Richard W. Goldberg
                     JUDGE

Dated:    August 29, 2000
          New York, New York.