SLIP-OP 00-167

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: JAMES L. WATSON, SENIOR JUDGE**

| | |
|---|---|
| **GLAXO WELLCOME INC.,** ) | |
| ) | |
| **Plaintiff,** | |
| ) | **Court No. 96-07-01792** |
| **v.** | |
| ) | |
| **UNITED STATES,** ) | |
| **Defendant.** ) | |

[ Plaintiff's motion for summary judgment denied; defendant's cross-motion for summary judgment granted.]

Dated: December 21, 2000

Kaye, Scholer, Fierman, Hays & Handler, LLP (Michael P. House, R. Will Planert and Margaret E. Scicluna, Esqs.), for plaintiff.

David W. Ogden, Assistant Attorney General, Joseph I. Liebman, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Barbara S. Williams, Esq.); Yelena Slepak, Assistant Chief Counsel, International Trade Litigation, United States Customs Service, of counsel, for defendant.

**OPINION AND ORDER**

**WATSON, SENIOR JUDGE:**

**INTRODUCTION**

Plaintiff, Glaxo Wellcome Inc. ("Glaxo"), a leading research-based pharmaceutical company and importer of pharmaceutical products from the United Kingdom, challenges the assessment of duty upon liquidation of its three entries by the United States Customs Service ("Customs") under subheading 3004.90.60 of the Harmonized Tariff Schedule of the United

States ("HTSUS") at the rate of 6.3 percent <u>ad</u> <u>valorem</u>. The latter rate was in effect on December 28, 1994 when plaintiff entered its merchandise for immediate transportation ("I.T.") at the Port of Norfolk, Virginia to the Port of Durham, North Carolina.

Plaintiff claims that its entries should have been liquidated by Customs duty-free under subheading 3004.90.90, HTSUS, a reduced duty rate and new HTSUS subheading that was put into effect with respect to the subject merchandise entered for consumption or withdrawn from warehouse for consumption on and after January 1, 1995 pursuant to Presidential Proclamation 6763 ("Proclamation"). Glaxo's pharmaceuticals were entered for consumption on January 3, 1995 at the destination Port of Durham, North Carolina. Thus, after plaintiff's merchandise was entered for I.T. at Norfolk on December 28, 1994, the Proclamation became "effective with respect to goods entered or withdrawn from warehouse for consumption on and after January 1, 1995," and reduced the duty rate to zero percent on plaintiff's pharmaceuticals (hereinafter referred to as the Proclamation's "effective date provision"). 60 Fed. Reg. at 1009.

The gravamen of plaintiff's complaint is that notwithstanding that its merchandise had been entered for immediate transportation on December 28, 1994, since the subject merchandise was entered for consumption on January 3, 1995, the merchandise qualified for the duty-free (zero) rate of duty then in effect under subheading 3004.90.90, pursuant to Proclamation 6763.

The dispute in this case is the applicable subheading under the HTSUS and the rate of duty for plaintiff's goods, and therefore, this action is before the court pursuant to its jurisdiction under 19 U.S.C. § 1581(a). Before the court are the parties' cross-motions for summary judgment pursuant to USCIT Rule 56. The court finds there is no genuine issue of material fact and this

case may be resolved by summary judgment. USCIT R. 56(d); Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 247 (1986).

## STATUTE INVOLVED

The statutory provision the Government claims is determinative of the applicable rate of

duty on plaintiff's 1994 entries for immediate transportation, 19 U.S.C. § 1315(a)(2), reads:

**§ 1315. Effective date of rates of duty**

**(a) Articles entered or withdrawn from warehouse for consumption**

Except as otherwise specially provided for, the rate or rates of duty
imposed by or pursuant to this chapter or any other law on any article
entered for consumption or withdrawn from warehouse for consumption
shall be the rate or rates in effect when the documents comprising the
entry for consumption or withdrawal from warehouse for consumption
and any estimated or liquidated duties then required to be paid have
been deposited with the Customs Service * * * , except that

* * * *

**(2)** any article which is not subject to a quantitative or tariff
rate quota and which is covered by an entry for immediate
transportation made at the port of original importation under
section 1552 of this title, if entered for consumption at the
port designated by the consignee, or his agent, in such
transportation entry without having been taken into the custody
of the appropriate customs officer under section 1490 of
this title, shall be subject to the rate or rates in effect when
the transportation entry was accepted at the port of original
importation; * * *

See also: 19 C.F.R. §§ 141.69, 152.17 (changes in duty rates by Presidential Proclamations are
subject to the provisions of § 141.69, including the exception under subsection (b) for I.T.
entries).

## THE RECORD

The evidentiary record before the court on the cross-motions comprises of a stipulation of

facts, copies of Customs' administrative messages in dispute, Customs' ruling letters, an affidavit of a Customs official submitted by defendant, and other documentary evidence. Plaintiff takes exception to the affidavit submitted by defendant.

The following comments are intended to obviate most of plaintiff's objections to defendant's affidavit, which are without merit.

While motions for summary judgment may be submitted for decision solely on stipulated facts, the stipulated facts before the court do not provide that the action is submitted solely on the stipulated facts. Accordingly, defendant was entitled to, and did, submit an affidavit, which is explicitly permissible in summary judgment practice under USCIT Rule 56.

If a party submits an affidavit in support of or in opposition to a motion for summary judgment, the form of the affidavit must comply with Rule 56(e), which includes the requirement that it be made on personal knowledge, shall set forth facts that would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify as to the matters stated therein. Id. If the foregoing requirements are met, an affidavit is an acceptable form of evidence under Rule 56(e), and the credibility of the affiant or veracity of the averments are not issues that may be resolved on summary judgment. However, the facts averred in an affidavit may be disputed by an opposing affidavit, a deposition, or answers to interrogatories, Rule 56(e), in which event, the case must proceed to trial to resolve genuine issues of material fact. Finally, Rule 56 does not require that a party give prior notice to the other party that an affidavit will be submitted in support of or in opposition to a motion for summary judgment.

The court turns to plaintiff's substantive objections to the content of the affidavit.

Defendant's affiant is Ms. Vera Adams, the Director of the Commercial Processing Division, Office of Trade Programs (formerly called the Office of Trade Operations), a position she had held since approximately June 1998. Prior to this position, Adams was a former Import Specialist in St. Louis, Missouri and New Orleans, LA., and a supervisor of the entry divisions in Memphis, TN and New Orleans, LA.

Ms. Adams avers she has been with Customs for some 11 years, has been involved in entry procedures and other matters, and that she is familiar with the administrative messages at issue, which are official Customs Service documents that in 1994-95 were issued by the Office of Trade Operations, the same office where she is currently employed. Plaintiff has interposed no objection to the administrative messages as part of the record before the court.

In her affidavit, Adams testifies concerning entry procedures, such as immediate delivery, immediate transportation, warehouse entries, and other entry procedures that are adequately described by statutes (see 19 U.S.C. §§ 1315(a), 1448(b), 1484(a), 1551, 1552, and 1505(a)), by Customs Regulations (see 19 C.F.R. §§ 141.21(a) through (f), 141.68, 141.69, 142.21, and 142.22(b)), and also by publications in the public domain. Notwithstanding Ms. Adams long experience and competence with respect to the administrative aspects of entry procedures, to the extent that Ms. Adams testimony provides her own legal interpretations of the various statutes and regulations covering entry procedures, they are not proper factual averments. With respect to Adams' characterizations of Customs' administrative messages at issue, their effect and clarity (or lack thereof) speak for themselves. Finally, there is no contention that the affidavit is inconsistent with any stipulated facts, and the court agrees with plaintiff that "[t]here are no

genuine issues of material fact at issue in this case." Pltf's Br. in Opposition at 1.

**UNDISPUTED FACTS**

On December 8, 1994, Congress passed the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ("URAA"), to implement the trade agreements reached in the multilateral trade negotiations. Among other tariff modifications, the URAA reduced or eliminated customs duties on various products, including the elimination of duties on plaintiff's pharmaceutical products. The URAA authorized the President to proclaim changes in the HTSUS in conformity with the trade agreements and the Act. URAA, § 111, 19 U.S.C. §§ 2902, 3521 (1996).

On December 19, 1994, Glaxo's exporter in the United Kingdom shipped pharmaceutical products to the United States classifiable, at that point in time, under subheading 3004.90.60, HTSUS, and dutiable at the rate of 6.3 percent ad valorem.

On December 23, 1994, President William J. Clinton signed Presidential Proclamation 6763 to implement the Uruguay Round Agreements Act and trade agreements resulting from the multilateral trade negotiations. 60 Fed. Reg. 1007 (1995). The Proclamation provided, inter alia, that the duty rate on pharmaceutical goods previously classified under HTSUS under subheadings 3004.90.30 and 3004.90.60 would be classified under a new HTSUS subheading 3004.90.90 and would be subject to a zero percent rate of duty (duty-free). Annex, at Section A, Item 156(a), 60 Fed. Reg. at 1207 (1995). The Proclamation further stated that the Section A modifications, such as that establishing the new subheading 3004.90.90, "shall be effective with respect to goods entered, or withdrawn from warehouse, for consumption, on and after January 1,

1995." 60 Fed. Reg. at 1013 . The new subheading 3004.90.90, HTSUS, created no substantive

modification of the tariff classifications under the former subheading numbers 3004.90.30 and

3004.90.60, but simply modified the duty rate provided for the products classifiable under the

applicable former subheadings. Significantly, the Proclamation's provisions affecting the duty

rate for the subject pharmaceuticals make no reference whatever to the applicable rate of duty for

merchandise entered for immediate transportation prior to January 1, 1995 (or thereafter), or

purport to supercede the statutory applicable rate exception for I.T. entries under § 1315(a)(2 ).[1]

On December 28, 1994, Glaxo's merchandise arrived in the United States, initially at the

Port of Norfolk, Virginia (the "port of original importation"), and thereupon, plaintiff's

customhouse broker, the Fritz Companies ("Fritz"), made the three entries for "immediate

transportation" to the Port of Durham, North Carolina, where subsequently the merchandise was

entered for consumption on January 3, 1995. At all times relevant to this case, Fritz was a

participator in the Automated Broker Interface ("ABI").

Again, at the time Glaxo's merchandise was entered for immediate transportation at

Norfolk, it was dutiable at the rate of 6.3 percent ad valorem pursuant to subheading 3004.90.60,

HTSUS. At the time the merchandise was entered for consumption at Durham, on January 3,

---

[1] Thus, the Proclamation, Annex A, essentially performed two functions: First, it created a new subheading, 3004.90.90, HTSUS, to encompass the merchandise previously classifiable under subheadings 3004.90.60 and 3004.90.30, which reduced the duty rate on the pharmaceuticals to zero. Second, modifications to the HTSUS would be "effective with respect to goods entered or withdrawn from warehouse for consumption, on and after January 1, 1995. 60 Fed. Reg. at 1009. Neither the creation of the new subheading nor the duty rate reduction for consumption entries made on and after January 1, 1995 (nor the combination of those changes) specially provide for the rate of duty applicable to the 1994 I.T. entries.

1995, the Proclamation had reduced the duty-rate to zero on the subject merchandise and created a new subheading for the merchandise, subheading 3004.90.90.

Commencing on December 15, 1994, and ending on January 4, 1995, due to the tariff modifications under the Proclamation, Customs issued a series of administrative messages to ABI brokers and other members of the importing community alerting the concerned persons of year-end entry problems and procedures related to the filing of immediate delivery ("I.D.") entries and the duty rate changes effective on January 1, 1995 under the Proclamation. The messages were intended primarily to remind ABI brokers that Customs had authorized special procedures to address certain immediate delivery entry-related problems so that I.D. filers could take advantage of the reduced Uruguay Round duty rate reductions that would take effect on January 1, 1995. Further, a message dated January 4, 1995 specifically addressed I.T. entries, as discussed infra.

Customs' administrative message 94-1261 of December 15, 1994, provided "helpful hints or reminders that may be useful at this time of the year," pointing out to ABI participants of the "date problems" incident to year-end transactions, including the ACS (Automated Commercial System) "date hierarchy" for duty computation and fees, and the message specifically pointed out that the hierarchy "begins with the I.T. date."(emphasis added).

Administrative message 94-1271 of December 16, 1994, alerted ABI brokers as to Customs' "blanket authorization for the release of merchandise under the immediate delivery (ID) procedures in accordance with 19 CFR 142.21(g) (see 19 U.S.C. § 1448(b)) for those filers that want to take advantage of reduced tariff rates * * * at the end of the calendar year." The

message goes on to instruct how importers could mark the CF 3461 entry documentation to reflect a change to I.D. procedures, and hence, a change in entry date from the date of immediate release to the date of filing the entry summary, which "will allow filers to elect a date of entry in order to take advantage of [the 1995] tariff changes or special programs."

Customs message 94-1316 of December 22, 1994, also pointed up that importers may choose to obtain release under "entry" or "immediate deliver" [sic] procedures (but not for quota-class merchandise) "in order to elect a date of entry which will be most beneficial to them" in light of the 1995 duty rate changes. Significantly, too, the message emphasized that applicable rates of duty would be determined in accordance with 19 C.F.R.§ 141.69, which should have alerted I.T. filers to the exception in paragraph (b) for immediate transportation entries.

Thereafter, on December 29, 1994, Customs issued administrative message 94-1380 to all ABI brokers acknowledging that "instructions issued allowing the filing of immediate delivery's (I.D.) for most importations were not generally understood." Customs further acknowledged that the confusion "resulted in shipments entitled to I.D. privilege being filed under normal entry procedures," and that "many electronically filed entries were processed by the system as 'entries', not I.D.'s." Continuing, the messages states: "Therefore, to ensure equitable and uniform treatment for all filers, the use of the 1995 entry summary date as the entry date for those shipments released on or after December 16, 1995 [sic], until December 31, 1994, will be allowed. This will apply exclusively to those shipments that are entitled to the immediate delivery procedure." (Emphasis added.)

Up to January 28, 1994, the messages provided no reminders or instructions to I.T. filers.

As previously noted, the subject merchandise was entered for immediate transportation on December 28, 1994, and then entered for consumption on January 3, 1995, whereupon the merchandise was released to the importer.

Finally, on January 4, 1995, Customs issued an unnumbered administrative message which, inter alia, advised all ABI brokers that in the case of a direct arrival shipment (for which the effective date for determining the applicable rate of duty is the date of entry (usually the date of release)), Customs Headquarters had granted retroactive (from December 16, 1994 through December 31, 1994) "blanket I.D. privileges" to all non-quota shipments. That privilege, granted for the direct arrival shipments had the effect of permitting release of the merchandise under a CF 3461 entry, but payment of duty at the rate in effect at the time of entry summary (within 10 working days after release). The message explains that the blanket I.D. privileges were made retroactive "because so many filers did not understand the proper procedures for designating a CF 3461 as an immediate delivery document;" and that the direct arrivals released from December 16th through December 31st could use the l995 duty rates.

The January 4, 1995 messages goes on to remind I.T. filers that "the IT date determines the rate of duty on any entry that is entered on an IT," and admonished import specialists they "should be especially mindful of this when reviewing entries because many filers do not understand this point and think they should use the 1995 rates when in fact the 1994 rates apply to 1994 ITS, even if the merchandise was entered for consumption in 1995." The message then points out that "[t]he only exception for IT shipments is warehouse withdrawals. The effective duty rate on a warehouse withdrawal is the rate in effect on the date of withdrawal."

The message also states that many I.T. filers had asked to retroactively change consumption entries to warehouse entries, and that such change would be allowed "only if the merchandise is still in the carrier's possession." There is no evidence that following the I.T. entries at Norfolk, Fritz had ever sought to utilize the warehouse entry procedure, or asked to retroactively change the consumption entries to warehouse entries. Thus, in essence, the January 4, 1995 message reminded importers who had made I.T. entries in 1994 and whose merchandise was still in the possession of the carrier to enter their merchandise for warehouse (rather than for consumption), and then make withdrawals from warehouse in 1995 to obtain the 1995 duty rates. Plaintiff entered its merchandise for consumption on January 3, 1995 rather than for warehouse.

On April 21, 1995, the subject entries were liquidated by Customs at a duty rate of 6.3 percent ad valorem pursuant to subheading 3004.90.60, HTSUS, the subheading and rate of duty in effect for the merchandise on December 28, 1994 when the goods initially arrived at the port of original importation - - Norfolk - - and were entered for immediate transportation to Durham, North Carolina. Following administrative protest procedures contesting the assessment of duties, administrative review,[2] and denial of the protest, plaintiff commenced this action by the filing of a timely summons on July 23, 1996.

**PARTIES' CONTENTIONS**

Plaintiff contends that the qualifying clause of § 1315(a), "[e]xcept as otherwise specially provided for," renders inapplicable subsection (a)(2), covering the statutory exception for

---

[2] On January 16, 1996, Customs Office of Regulations and Rulings issued a ruling in response to an Application for Further Review of the protest. The text of the ruling is part of the record in the current proceedings.

immediate transportation entries, because the Proclamation provides for duty-free entry of merchandise entered for consumption on and after January 1, 1995 under a newly created HTSUS subheading. Glaxo further contends that in any event, Customs is precluded from applying the statutory exception because Customs' administrative messages failed to address I.T. entries, and discriminated against I.T. filers. Finally, plaintiff posits that application of § 1315(a)(2) to plaintiff's entries would conflict with U.S. international obligations to provide duty-free entry for the subject merchandise pursuant to the Uruguay Round trade agreements. In short, plaintiff's position is that it is entitled to the reduced 1995 duty rate.

Defendant argues that in order for the Proclamation to supercede § 1315(a)(2) pursuant to the "[e]xcept as otherwise specially provided for" clause of § 1315(a), the Proclamation must specially provide the duty rates applicable to immediate transportation entries in 1994 (not merely to consumption entries on and after January 1, 1995). Accordingly, argues defendant, since the Proclamation does not specially provide for the applicable duty rate for merchandise entered for immediate transportation in 1994, by default, the applicable rate of duty under the statutory exception for I.T. entries under § 1315(a)(2) remains in full force and effect with respect to the subject merchandise. Defendant further maintains that Customs' 1994 year-end entry procedures, including the administrative messages, should not have misled I.T. filers, and was not discriminatory with respect to I.T. filers. Finally, defendant contends that the application of § 1315(a)(2) does not conflict with U.S. international obligations.

For the following reasons, the court agrees with the foregoing contentions of defendant and grants defendant's motion for summary judgment.

## DISCUSSION

### I.

**Presidential Proclamation 6763 does not "otherwise specially provide for" the applicable rate of duty for merchandise entered for immediate transportation in 1994. Accordingly, by default, 19 U.S.C. § 1315(a)(2) remains in full force and effect with respect to Glaxo's entries for immediate transportation made in 1994.**

While seemingly complex at first blush, the material facts and issues of law in this case are quite straight forward.

There is no dispute in this case that duty rate changes pursuant to a Presidential proclamation may, depending of course upon the particular provisions of the proclamation, be subject to the rules for immediate transportation entries under § 1315(a)(2) and 19 C.F.R. § 141.69(b). See 19 C.F.R. § 152.17. The introductory clause of §1315(a) provides, "[e]xcept as otherwise specially provided for," and the statute then states the general rule for applying the rate in effect at the time articles are entered for consumption or withdrawn from warehouse for consumption. Following the general rule, the statute sets forth three exceptions, one of which, § 1315(a)(2), applies to entries for immediate transportation. Defendant does not dispute that the introductory qualifying clause of § 1315(a) may apply to a Presidential proclamation. See North American Foreign Trading Corp. v. United States, 8 CIT 359, 600 F. Supp. 226 (1984), reh'g denied, 9 CIT 80, 607 F. Supp. 1471 (1985), aff'd, 783 F.2d 1031 (Fed. Cir. 1986). Defendant, however, contends that Proclamation 6763 contains no provision that "specially provides for" the rate of duty applicable to immediate transportation entries, and therefore, by default, the statutory exception for I.T. entries under § 1315(a)(2) remains in full force and effect with respect to Glaxo's entries. I agree.

Essentially, plaintiff posits that since Proclamation 6763 specially provides for a new

HTSUS subheading covering the subject merchandise and a new zero duty rate applicable to

entries for consumption or withdrawals from warehouse for consumption on and after January 1,

1995, the statutory exception under § 1315(a)(2) for I.T. entries is superceded by the

Proclamation. I disagree.

Fundamentally, of course, a statute's intent must first be discerned from its plain

meaning. Timex V.I., Inc. v. United States, 157 F.3d 879, 882 (Fed. Cir. 1998). Thus, for a

proclamation to supercede the statutory exception for I.T. entries under § 1315(a)(2) pursuant to

the qualifying clause of § 1315(a), particularly the term "specially,"[3] the proclamation must

specially provide for the applicable rate of duty for merchandise entered for immediate

transportation. Defendant insists that the Proclamation's creation of a new HTSUS subheading

and a zero rate duty reduction for the subject pharmaceuticals applicable to merchandise entered

for consumption or withdrawn from warehouse for consumption on and after January 1, 1995, do

not "otherwise specially provide for" the applicable rate of duty for I.T. entries made in 1994.

Based on the plain meaning of the statute and the provisions of the Proclamation relied on by

plaintiff, I am compelled to agree with defendant's position.

Essentially, plaintiff argues that the Proclamation by applying a reduced duty rate to the

subject merchandise under a new HTSUS subheading has at least impliedly superceded the

---

[3]In quoting the relevant language of §1315(a) in North American Foreign Trading Corp. v. United States, the court, in dicta, substituted the word "specifically" for the word "specially." 9 CIT at 81-82, 607 F. Supp. at 1473-74. For purposes of § 1315(a), the difference in terminology is inconsequential. Additionally, Customs regulation, 19 C.F.R. § 141.69 also substituted the word "specifically" for "specially."

provisions of § 1315(a)(2).[4] The plain language "except as otherwise specially provided for" while expressly indicating that the provisions of the statute may be "specially" superceded by a proclamation, this court rejects simply implying from silence in the Proclamation with respect to merchandise entered for I.T. entries, that the statutory exception is superceded. Permitting the effective date provision of the subject Proclamation (which, like all Presidential proclamations that modify duty rates, is referenced to the standard or general rule for entries for consumption or withdrawals from warehouse for consumption on and after a specified date) to supercede the statutory exception by virtue of the qualifying clause of § 1315(a) would mean that virtually all duty rate changes by a Presidential proclamation supercede the statutory exception for I.T. entries. Plaintiff's argument impermissibly seeks to delete the word "specially" from the qualifying clause of § 1315(a) and the word "specifically" from 19 C.F.R. § 141.69, and require the court to divine an implied intent of the Proclamation to supercede the statutory exception for I.T. entries under § 1315(a)(2). The difficult interpretive problem that plaintiff's contention would create is easily avoided simply by giving the qualifying adverb "specially" its common meaning.

In sum, the language in § 1315(a), "specially" is the antithesis of implying a retroactive

---

[4] Proclamation 6763, signed on December 23, 1994, was prima facie only effective prospectively to make the Uruguay Round duty rate modifications applicable on and after January 1, 1995. However, plaintiff essentially argues that the qualifying clause of § 1315(a) permits the Proclamation's new HTSUS subheading and zero rate of duty for the subject merchandise entered for consumption or withdrawn from warehouse for consumption on and after January 1, 1995, to be applied retroactively to supercede the subheading and duty rate that applied to the merchandise on December 28, 1994 pursuant to Glaxo's entries for immediate transportation. Such reading of the qualifying clause in § 1315(a) is untenable.

override of subsection (a)(2). Statutes must be interpreted, if possible, to given each word some operative effect. See Walters v. Metropolitan Educ. Enterprises, Inc., 519 U.S. 202, 209 (1997); United States v. Gold Mountain Coffee, Ltd., 8 CIT 336, 338, 601 F. Supp. 212, 215 (1984) ("An interpretation of a statute that causes any part of it to be meaningless is strongly disfavored, 'every effort [must be] made to give full effect to all of the language contained therein.'") (quoting Dart Export Corp. v. United States, 43 CCPA 64, 74 (1956), cert. denied, 352 U.S. 824 (1956)). Therefore, while there can be no question that a proclamation can by appropriate language supercede § 1315(a)(2) and thereby "otherwise specially provide for" the rates of duty applicable to immediate transportation entries, Proclamation 6763, simply does not specially address rates of duty for an immediate transportation entry.[5] Accordingly, while the Proclamation has the force and effect of law when issued pursuant to statutory mandate or delegation of authority from Congress, see Independent Meat Packers Ass'n v. Butz, 526 F. 2d 228, 234 (8th Cir. 1975), cert. denied, 424 U.S. 966 (1976),[6] the Proclamation does not "otherwise specially provide for" the applicable rate of duty for immediate transportation entries. Consequently, like

_____

[5]As aptly put by defendant, the Proclamation could have provided that it was effective with respect to goods entered, or withdrawn from warehouse for consumption on and after January 1, 1995, as well as with respect to goods entered for immediate transportation before January 1, 1995, and entered for consumption on or after January 1, 1995." Deft's Br. at 11-12.

[6] See also Gnotta v. United States, 415 F.2d 1271, 1275 (8th Cir. 1969), cert. denied, 397 U.S. 934 (1970); Farkas v. Texas Instruments, Inc., 375 F.2d 629, 632 n.1 (5th Cir. 1967), cert. denied, 389 U.S. 977 (1967). Significantly, Customs Regulations provide that Presidential proclamations that change duty rates are governed by 19 C.F.R. § 141.69, including the exception for I.T. entries in § 141.69(b). As held above, the provisions of the Proclamation that changed the duty rate for Glaxo's pharmaceuticals do not specially provide for the applicable rate of duty for I.T. entries. Consequently, the change of duty rate for Glaxo's merchandise under the Proclamation is subject to § 141.69(b) of the Customs Regulations and to 19 U.S.C. §1315(a)(2).

the general or standard rule under § 1315(a) that references the date of entry for consumption or withdrawal from warehouse for consumption for determining the applicable rate of duty, the Proclamation's essentially identical effective date provision remains subject to the statute's exception under subsection § 1315(a)(2).

In sum, since the Proclamation clearly does not specially provide for the rate of duty applicable to 1994 I.T. entries, by default the provisions of § 1315(a)(2) and 19 C.F.R. § 141.69(b) are applicable in determining the duty rate to be assessed on plaintiff's merchandise. See also 19 C.F.R. §152.19 (duty rate changes by Presidential proclamation may be subject to § 141.69(b) for I.T. entries).

## II.

### The legislative history of the amendment of 19 U.S.C. § 1315.

The provisions of § 1315(a) were added to §1315 in 1953 as section 3(a) of the Customs Simplification Act of 1953. See Act of August 8, 1953, Chapter 397, section 3(a), 67 Stat. 508. The legislative history of the amendment of the statute indicates that Congress intended to create uniformly applied definitive rules governing the determination of the applicable rate of duty to entries, including entries for immediate transportation, to reduce the uncertainty, confusion, and inconsistency of interpretation as demonstrated in prior court decisions, such as Mussman & Shafer, Inc. v. United States, 27 Cust. Ct. 180, C.D. 1367 (1951), aff'd, 40 CCPA 108, C.A.D. 506 (1953). Prior to the 1953 amendment, § 1315 did not expressly provide a definitive rule for determining the applicable rate of duty. See S. Rep. No. 83-632, 83rd Cong. 1st Sess. (July 24, 1953), reprinted in 1953 U.S.C.C.A.N. 2283, 2287. See also H. Rep. No. 760, 83rd Cong. 6-8

(July 24, 1953).

In <u>Mussman</u>, the fact that the subject merchandise had originally been entered for immediate transportation had no particular significance under the law in effect at the time of the entries, and the decision does not address the issues in the current case. It is beyond cavil, however, that Congress amended the statute so as to fix a specific time in the importing process for determining the applicable rate of duty for entries, including a definitive exception for immediate transportation entries. Hence, there can be no doubt that a liberal or overly broad application of the qualifying clause in § 1315(a) to permit a proclamation that is silent with respect to the applicable rate of duty for immediate transportation entries to supercede the definitive exception under (a)(2) would defeat the Congressional purpose to achieve clarity and avoid confusion.

**III.**

**Customs' 1994 year-end entry procedures and administrative messages do not afford any legal basis for the court to "preclude" Customs from applying § 1315(a)(2).**

The court now turns to plaintiff's contentions that Customs' 1994 year-end entry procedures and administrative messages were incomplete and confusing because they did not address procedures for I.T. filers such as Glaxo. The messages indicate that Customs was aware of confusion on the part of <u>immediate delivery filers</u> caused by the 1994 year-end instructions and authorizations, but there is no suggestion in any of the messages that Customs was aware of any confusion on the part of immediate transportation filers caused by the year-end instructions or procedures for I.D. entries. Given the facts that:  (1) Customs' 1994 year-end messages did not

address I.T. filers; (2) Customs' messages advised the importing community that Customs' ACS date hierarchy for duty computation began with the I.T. date (message 94-1261 of December 15, 1994); and (3) Customs specifically referenced 19 C.F.R. § 141.69 for determining the applicable rate of duty (Message 94-1316 of December 22, 1994), Fritz should not have been misled by the messages. Indeed, there is no proof that Fritz was actually confused or ever sought any clarification by Customs before making entry of Glaxo's merchandise for immediate transportation on December 28, 1994.

Whatever the merits of plaintiff's claim that the 1994 messages were incomplete and misleading because there were no instructions to I.T. filers until the message of January 4, 1995, plaintiff's claims must fail as a matter of law. The remedy sought by plaintiff - - preclusion of Customs from applying the provisions of §1315(a)(2) and 19 C.F.R. § 141.69(b) - - raises the specter of equitable estoppel against the United States. See Office of Personnel Management v. Richmond, 496 U.S. 414, 422 (1990) (Supreme Court has never upheld an estoppel claim against the Government for the payment of money); New Zealand Lamb Co., Inc. v. United States, 149 F. 3d 1366, 1368 (Fed. Cir. 1998) (To the extent that plaintiff's argument raised the specter of equitable estoppel, it must fail because equitable estoppel is not available against the government in cases involving collection or refund of duties on imports). As stressed by the Supreme Court in Richmond, a rule of estoppel against the Government would invite endless litigation over both real and imagined claims of misinformation, lack of clarity in instructions and advice, and thereby impose an unpredictable and substantial drain on the public fisc, and might prompt the Government, in order to limit liability, to cut back and impose strict controls on the free and

valuable information it now provides to the public. See also Dazzle Mfg., Ltd. v. United States, 21 CIT 827, 971 F. Supp. 594 (1997) (rejecting the application of equitable estoppel).

Plaintiff's claim that Customs' 1994 year-end procedures were "unfair" and "discriminated" against I.T. filers because they were not accorded the same "privileges" as non-I.T. filers is also without merit. Essentially, plaintiff claims that because Customs' 1994 year-end procedures and administrative messages sought to accommodate importers that were entitled to immediate delivery procedures and other non-I.T. filers by "blanket authorizations" for retroactive changes in CF 3461 filings, Customs was required, but refused to, accord the same benefits to the 1994 year-end immediate transportation filers.

A detailed analysis of the complex myriad of statutes and regulations affecting different types of entry procedures is not required here. It suffices to state that the Customs laws provide different types of entries having different procedural requirements, advantages and disadvantages, and of course, different legal consequences with respect to duty rate modifications. Obviously, to comply with the applicable statutes and regulations governing entry procedures, Customs may be required to accord different treatment to importers utilizing different entry procedures.

As previously noted, at year-end 1994, Customs was faced with an imminent modification of duty rates and fees put into effect by Presidential Proclamation 6763, coupled with various logistical problems in the computer processing of I.D. and other types of entry procedures used by the ABI brokers and other importers. Under the Customs laws, different types of entries have different requirements and legal consequences. It is true that Customs' year-

end 1994 administrative messages gave no instructions to I.T. filers, but addressed the confusion caused by previous instructions to I.D. filers. In its message of January 4, 1995, for the first time, Customs reminded ABI brokers and import specialists that the 1994 duty rates must be applied to 1994 I.T. entries, even if the merchandise was entered for consumption in 1995. However, Customs made an exception to the foregoing where the merchandise was still in possession of the carrier, in which event, Customs permitted retroactive amendment of the consumption entry to a warehouse entry. Customs' treatment of the I.T. filers, while different than that accorded to the I.D. filers, was consistent with the statutes and regulations governing I.T., I.D., and warehouse entries.

## IV.

**Plaintiff's contention that Customs' assessment of duties on the subject entries pursuant to § 1315(a)(2) conflicts with the international obligations of the U.S. is without merit.**

We now turn to plaintiff's contention that Customs' application of § 1315(a)(2) to plaintiff's entries was inconsistent with U.S. obligations under the Uruguay Round trade agreements. Fundamentally, of course, courts attempt, to the extent possible, to harmonize the interpretation of domestic statutory law with sources of law reflecting U.S. international obligations. See, e.g., Federal-Mogul Corp. v. United States, 63 F. 3d 1572, 1581 (Fed. Cir. 1995). The trade agreements resulting from the Uruguay Round negotiations required that the United States eliminate customs duties on the subject pharmaceutical products, which agreements were implemented by Act of Congress and Presidential Proclamation 6763, effective with respect to entries for consumption or withdrawals from warehouse for consumption on or

after January 1, 1995. Glaxo posits that unless the qualifying language in § 1315(a), "Except as otherwise specially provided for" is interpreted by the court to permit the Proclamation to supercede or preempt § 1315(a)(2), then assessment of customs duties on the subject merchandise entered for consumption in 1995 conflicts with U.S. international obligations to provide duty-free entry. I disagree.

Significantly, the U.S. statutory scheme for determining the applicable rate of duty for I.T. entries under § 1315(a)(2), created by Congress in 1953 (see discussion supra), long preexisted the Uruguay Round negotiations. Neither the Uruguay Round trade agreements, the Implementation Act, nor the Proclamation make any reference whatever to modifications of 1994 duty rates applicable to entries for I.T. pursuant to U.S. statutory law under § 1315(a)(2). Clearly, U.S. international obligations do not require a retroactive elimination of duties on merchandise entered for immediate transportation in 1994 and entered for consumption in 1995. As held supra, the statutory term "specially" in the context of § 1315(a) precludes holding that the Proclamation may supercede the statutory exception for I.T. entries under (a)(2) by implication. In any event, the court sees nothing affecting U.S. international obligations related to the Uruguay Round agreements from which it could be implied that the statutory exception for I.T. entries under § 1315(a)(2) was superceded by the Proclamation.

Of course, the Proclamation should be read as harmonizing and not conflicting with § 1315(a)(2). See Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637-38 (1952) (concurring opinion). With respect to the applicable rate of duty for immediate transportation entries, the Uruguay Round agreements and implementing Proclamation may be harmonized

with §1315(a)(2) by adopting defendant's interpretation of the qualifying clause in § 1315(a).

Thus, there is no conflict to address. See Federal Mogul Corp. v. United States, 63 F.3d 1572,

1581 (Fed. Cir. 1995)(in the event of conflict the statute must prevail). See also Suramerica De

Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 667-668 (Fed. Cir.1992); Hyundai

Electronics Co. v. United States, 23 CIT ___, 53 F. Supp. 2d 1334 (1999); and Caterpillar Inc. v.

United States, 20 CIT 1169, 1176-77, 941 F. Supp. 1241, 1247 (1996).

## V.

**Customs' HQ Ruling 225111 is irrelevant to the issues in the current case.**

The court now turns to plaintiff's contention that its interpretation of the qualifying

language of § 1315(a) is buttressed by Customs Ruling HQ 225111.

HQ 225111, dated October 4, 1994 revolves around whether under an antidumping duty

order and § 1315(a), merchandise entered for immediate transportation on January 23, 1991,

before the publication of an antidumping duty order (viz., notice of preliminary determination)

on February 5, 1991, imposing antidumping duties on the merchandise if entered for

consumption on and after February 5, 1991, was subject to the imposition of antidumping duties.

The importer asserted that its merchandise was not subject to the imposition of antidumping

duties since the merchandise was "entered" on the date of immediate transportation, January 23,

1991, which was prior to the publication of the antidumping duty order.

Customs couched the issue as whether for purposes of the antidumping statute and order,

the merchandise was "entered" on January 23, 1991, prior to the effective date of the

antidumping duty order. Customs' ruling focused on the language of the antidumping duty notice

(which imposed a potential liability for antidumping duties on the subject merchandise with respect to unliquidated "entries" made on or after February 5, 1991) and the antidumping duty statute (19 U.S.C. §1673e(b)) ("Imposition of duty"), which sets forth a "General rule" and a "Special rule," providing for the imposition of antidumping duties on entries for consumption. Therefore, Customs reasoned that if the qualifying language of § 1315(a) is to have any meaning at all it must be applied to insure that goods which have moved under an I.T. entry, and were not entered for consumption until after the issuance of an antidumping duty order, are subject to antidumping duties. Customs further posited that the date of entry for purposes of antidumping duties is not changed by § 1315(a) or the exceptions, but rather states that the <u>duty rates in effect at a time other than the time of the consumption entry will apply</u>. The teaching of the ruling relied on by plaintiff is simply that for merchandise entered for immediate transportation, § 1315(a)(2) creates a different effective date for determining the applicable rate of duty than the date of the consumption entry, but for purposes of the imposition of antidumping duties, the date of a consumption entry remains the effective date that governs whether merchandise is subject to an antidumping duty order pursuant to § 1673e(b).

It is apparent from the foregoing that plaintiff's contention that HQ 225111 addresses the precise question in this case is frivolous.

## CONCLUSION

The court has considered plaintiff's other contentions, and find them totally lacking in merit. Also, as this court has come to its decision in this case independently, the court need not reach defendant's contention that the court must accord deference to Customs Ruling HQ 226400

pursuant to <u>Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.</u>, 467 U.S. 837, 866 (1984). <u>See also</u>, <u>Mead Corp. v. United States</u>, 185 F.3d 1304 (Fed. Cir. 1999), <u>cert. granted</u>, 120 S.Ct. 2193, 68 USLW 3739 (U.S. May30, 2000), <u>argued November 8, 2000</u>. For the foregoing reasons, the court concludes that Presidential Proclamation 6763 does not specially provide for the rate of duty applicable to merchandise entered for immediate transportation in 1994. Therefore, by default, for I.T. entries the duty rate reductions under the Proclamation remain subject to the provisions of §1315(a)(2) and 19 C.F.R. §§ 141.69(b) and 152.17. Customs' assessment of duties on plaintiff's merchandise at the duty rate in effect in 1994 was in full compliance with applicable law. Accordingly, plaintiff's motion for summary judgment is denied; defendant's cross-motion for summary judgment is granted. A separate final judgment is submitted herewith.


Dated: New York, New York
      December 21, 2000

                                        James L. Watson, Senior Judge